2004 UT 91

**Heidi J. JUDD, personally and as the natural parent and guardian of Athan Montgomery, for and on behalf of Athan Montgomery, Plaintiff and Appellant,**

v.

**Gregory DREZGA, M.D. and Tooele Valley Regional Medical Center, Defendants and Appellee.**

**No. 20010646.**

Supreme Court of Utah.

Nov. 5, 2004.

---

Ralph L. Dewsnup, Paul M. Simmons, Salt Lake City, for plaintiff.

Michael D. Zimmerman, James D. Gardner, David W. Slagle, Brian P. Miller, Salt Lake City, for defendant.

Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Reed M. Stringham, Asst. Att'ys Gen., Salt Lake City, for amicus State of Utah.

Merrill F. Nelson, Elliott J. Williams, Andrew G. Deiss, David C. Gessel, Salt Lake City, for amici Intermountain Health Care, Inc., Utah Hospitals and Health Systems Ass'n, and Utah Medical Ass'n.

WILKINS, Associate Chief Justice:

¶ 1 Plaintiff Heidi J. Judd, personally and as the parent and guardian of Athan Montgomery, appeals the trial court's reduction of a jury's general damage award from $1,250,000 to $250,000. We affirm.

## BACKGROUND

¶ 2 In 1997, Athan Montgomery was born with severe brain damage as a result of Dr. Gregory Drezga's incompetence in his failed attempt to deliver Athan with the use of forceps. Athan's mother, Heidi J. Judd, sued Dr. Drezga on Athan's behalf. Athan, who is now six, was three at the time of trial. The jury, having heard the evidence presented on behalf of Athan and Dr. Drezga, awarded Athan $22,735.30 for amounts already expended to maintain his life, and $1,000,000 as the amount necessary to maintain his life during his expected—although shortened—life span. The jury also awarded Athan $1,250,000 of so-called "noneconomic" damages in recognition of the difference between a life as a normal, healthy boy, and a life as he must now live it: severely brain damaged, with drastically reduced life experiences and expectations.

¶ 3 In 1986, the legislature enacted a statutory limitation on some forms of damages recoverable by victims in medical malpractice actions. Utah Code Ann. § 78–14–7.1 (2002). The limitation applies only to victims who have first established the malpractice of the medical professional, as well as the extent of the damage done by the professional. Moreover, for injuries occurring before July 1,

2001, as Athan's did, the limit applies only to those who have sustained over $250,000 in damages. *Id.* § 78–14–7.1(1)(a). No limitation applies to persons whose life experience is diminished or inconvenienced by a lesser amount, as determined by a jury. Upon motion by Dr. Drezga, the trial court reduced the jury's award to $250,000 pursuant to section 78–14–7.1(1)(a).

¶ 4 The damages that the statute limits are commonly referred to by various names, but amount to the same measure: pain and suffering, noneconomic loss, or general damages. The terms "noneconomic loss" and "general damages" merely euphemize what the damages truly represent—diminished capacity for the enjoyment of life. The measure is actually the difference between what life would have been like without the harm done by the medical professional, and what it is like with that additional burden. In Athan's case, the difference is dramatic in terms of his abilities, his joys, his opportunities, and his life expectancy. These damages are often called "noneconomic" because they are a measure of the cost neither of medical and other necessary care the malpractice caused nor of decreased earning ability. Those damages are considered more finite, measurable, and "economic" because they are more easily calculated on the basis of projected life expectancy, expected medical difficulties, and reduced earning capacity. Economic damages on the other hand, are not restricted, presumably because they are less likely to be exaggerated by a jury, and also because they are "hard" amounts, subject to careful calculation.

¶ 5 Athan's quality of life damages, the $1,250,000 awarded by the jury that heard the evidence about his condition and presumably compared it to a "normal" life experience, are the only portion of his recovery that the legislature has limited. The legislature imposed this cap because it was convinced that doing so would limit malpractice insurance costs for medical professionals, thereby helping to control excessively high medical care costs and health insurance premiums paid by most citizens and assuring a continued supply of medical care to all. This

was a policy choice made by the legislature, as is its duty.

¶ 6 Judd asks us to consider whether the legislature's limitation on Athan's recovery of quality of life damages from Dr. Drezga is constitutionally infirm. In other words, she asks us to review the protections afforded all citizens, including Athan, by our state constitution, and conclude that these protections are sufficient to protect Athan from the seemingly arbitrary 80% reduction in the compensation available to improve a life diminished in opportunity, satisfaction, and accomplishment by the uncontested incompetence of Dr. Drezga.

¶ 7 Specifically, Judd asks us to strike down the cap on quality of life damages on any one or more of five Utah constitutional grounds. She claims that, first, the cap violates the protections of the open courts provision of article I, section 11; second, the cap violates Athan's right to the uniform operation of laws under article I, section 24; third, the cap violates the guarantee of due process under article I, section 7; fourth, the cap violates Athan's right to a jury trial in civil cases as guaranteed by article I, section 10; and finally, the cap violates the separation of powers protections of article V, section 1.

¶ 8 On appeal, Dr. Drezga does not contest the trial judge's conclusion that his negligence was so clearly evident that the question of his malpractice on Athan need not even be considered by the jury. He also does not contest the award to Athan of $1,022,735.30 for economic damages. Nor does he contest the *amount* of the damages found by the jury to compensate for Athan's diminished life experience—the quality of life damages of $1,250,000. Instead, Dr. Drezga argues that the trial court correctly reduced Athan's quality of life damages based on the statutory cap on such damages imposed by the legislature, and on our historic deference to the decisions of the legislature on questions of public policy. Dr. Drezga is joined in his defense by the Attorney General of Utah, the Utah Medical Association, the Utah Hospitals and Health Systems Association, and Intermountain Health Care.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 9 We review the trial court's reduction of Athan's judgment for correctness given the constitutional questions Judd raises. *Grand County v. Emery County*, 2002 UT 57, ¶ 6, 52 P.3d 1148.

### II. OPEN COURTS CLAUSE

■ ¶ 10 This court has held, since our decision in *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), that citizens of Utah have a right to a remedy for an injury. Article I, section 11 of the Utah Constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay." Utah Const. art. I, § 11. As part of our *Berry* jurisprudence, we have fashioned a test by which we can discern whether the legislature had sufficient reason to diminish or eliminate a previously existing right to recover for an injury. Despite articulate and passionate arguments to the contrary, we find no open courts violation in the cap on quality of life damages imposed by Utah Code section 78–14–7.1 as applied to Athan's damages. Athan's cause has been allowed before and ruled upon by the courts, and his remedy has been diminished, but not eliminated. The protections of the open courts provision have not been offended.

¶ 11 Our past jurisprudence has clearly and firmly established the following test for violations of the Open Courts Clause:

[S]ection 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated....

... [I]f there is no substitute or alternative remedy provided, abrogation of the remedy ... may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Berry*, 717 P.2d at 680. The Attorney General invites us to disavow our *Berry* line of cases, and to recognize that by adopting the *Berry* approach we have assumed powers and duties not properly held by the court, but reserved for the legislature. This we decline to do. However, we recognize an obligation of deference to legislative judgments in a *Berry* review, and to the extent this differs from our prior application of *Berry*, those prior applications are disavowed. Accordingly, we now address the question at hand—whether the cap on quality of life damages violates the Open Courts Clause.

#### A. Substitute Remedy

¶ 12 Proceeding to our application of the *Berry* test, it is self-evident that the cap on quality of life damages, which does nothing more than reduce Athan's recovery, does not provide a substitute remedy substantially equal to that abrogated. Accordingly, we must consider the second portion of the *Berry* test as it pertains to the damage cap—whether the damage cap represents a reasonable, nonarbitrary method of reducing increasing health care costs and other dangers that the legislature views as clear social or economic evils.

#### B. Clear Social or Economic Evil

¶ 13 Recovery of quality of life damages in Athan's case is limited to $250,000 by Utah Code section 78–14–7.1(1)(a). Utah Code Ann. § 78–14–7.1(1)(a) (2002). The legislature's stated purpose in enacting the cap is as follows:

The legislature finds and declares that the number of suits and claims for damages and the amount of judgments and settlements arising from health care has increased greatly in recent years. Because of these increases the insurance industry has substantially increased the cost of medical malpractice insurance. The effect of increased insurance premiums and increased claims is increased health care cost, both through the health care providers passing the cost of premiums to the

patient and through the provider's practicing defensive medicine because he views a patient as a potential adversary in a lawsuit. Further, certain health care providers are discouraged from continuing to provide services because of the high cost and possible unavailability of malpractice insurance.

In view of these recent trends and with the intention of alleviating the adverse effects which these trends are producing in the public's health care system, it is necessary to protect the public interest by enacting measures designed to encourage private insurance companies to continue to provide health-related malpractice insurance. . . .

*Id.* § 78–14–2 (2002). Although the empirical truth of these findings is a matter of some dispute, we will not undertake the same investigation as the legislature, reviewing its data-gathering methods and conclusions to determine whether the stated legislative findings are perfectly correct. A court is ill-suited to undertake investigation of such a nature. Our inquiry under the "clear social or economic evil" portion of the *Berry* test is more limited.

¶ 14 Both parties have cited various studies and articles, that ostensibly support their position that there is or is not a crisis in the health care industry caused in part by increased malpractice insurance premiums stemming from the possibility of unlimited awards for quality of life damages. Judd would have the court determine, based on this information, that the crisis does not actually exist, thereby rendering the cap unconstitutional under the *Berry* test. Although Judd's arguments are well taken, and the court may remain unconvinced of the wisdom

of limiting quality of life damages for severely injured victims like Athan, our power does not extend so far as to permit imposition of our views on such policy disputes.[1]

¶ 15 Our job as this state's court of last resort is to determine whether the legislature overstepped the bounds of its constitutional authority in enacting the cap on quality of life damages, not whether it made wise policy in doing so. Although there are indications that overall health care costs may only be minimally affected by large damage awards, there is also data that indicates otherwise. *See, e.g., Lee v. Gaufin,* 867 P.2d 572, 585–89 (Utah 1993) (noting pricing and investment decisions by insurers, inflation, etc., as factors contributing to increased health care costs). *But see* Office of Tech. Assessment OTA–BP–H–1 19, *Impact of Legal Reforms on Medical Malpractice Costs* 64 (1993) [hereinafter *Impact of Legal Reforms* ] (recognizing that "caps on damage awards were the only type of State tort reform that consistently showed significant results in reducing the malpractice cost indicators"). When an issue is fairly debatable, we cannot say that the legislature overstepped its constitutional bounds when it determined that there was a crisis needing a remedy.[2] Accordingly, we next consider whether the elimination of Athan's right to collect unlimited quality of life damages is a reasonable, nonarbitrary method for achieving the legislature's stated purpose of controlling medical malpractice premiums and health care costs.

### C. Nonarbitrary, Reasonable Nature of Cap

¶ 16 We cannot conclude that the cap on quality of life damages is arbitrary or unrea-

---

1. The dissent argues not that there is no intelligent support for the position taken by the legislature, but that there is more, better, or more intelligent support for alternative views. The defect in this approach is not in arguing that one set of views ought to prevail over the other, but in arguing that the views of a majority of members of this court should prevail over those of the majority of the legislature.

2. Arguing against the presence of a clear social or economic evil, Judd extensively cites this court's discussion in *Lee* regarding the so-called medical malpractice crisis. *Lee* involved a review under the Utah Constitution's uniform oper-

ation of laws provision of a limitations provision that applied without regard to a victim's minority at the time of the injury. 867 P.2d at 576–77. The reason for the court's declaration of unconstitutionality in *Lee* was that "[t]he legislative means for solving the insurance problem by cutting off the malpractice claims of minors simply does not further the legislative objective." *Id.* at 588. That question is different from the one now facing this court, and our review in *Lee* of the effect of that limitations provision does not apply. We will address the uniform operation of laws provision in connection with the problem now before us later in this opinion.

sonable. The legislature's determination that it needed to respond to the perceived medical malpractice crisis was logically followed by action designed to control costs. Although malpractice insurance rates may not be entirely controlled by such matters, they are undoubtedly subject to some measure of fluctuation based on paid claims. *Impact of Legal Reforms, supra,* at 73 (noting that "caps on damages ... lead to lower insurance premiums"). Thus, one nonarbitrary manner of controlling such costs is to limit amounts paid out. Intuitively, the greater the amount paid on claims, the greater the increase in premiums. Limiting recovery of quality of life damages to a certain amount gives insurers some idea of their potential liability. *Id.* at 64 ("Minimizing these large awards may allow insurers to better match premiums to risk."). While we recognize that such a cap heavily punishes those most severely injured, it is not unconstitutionally arbitrary merely because it does so. Rather, it is targeted to control costs in one area where costs might be controllable.

¶ 17 Despite this court's concerns about the wisdom of depriving a few badly injured plaintiffs of full recovery, the cap is also constitutionally reasonable. Rather than cap all damages, like the cap struck down in *Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989), the limitation on recoverable damages in this case is narrowly tailored, by limiting quality of life damages alone. While Judd notes that Utah has not seen large damage awards in significant numbers, this position ignores at least one important factor. Although quality of life damages are very real, they are also less susceptible to quantification than purely economic damages. As amici point out, "[t]he estimated value of future costs forms the basis of the [insurance] rate-setting process." The difficulty of predicting quality of life damages must be considered by insurers when setting rates and planning reserves. At least in some measure, then, predicting and controlling future costs can result in lower insurance rates. Taken as one of a number of measures enacted to help control health care costs, the cap on quality of life damages is thus a reasonable approach.

¶ 18 Having determined that the damage cap is designed to eliminate a social or economic evil, and that it is a reasonable, nonarbitrary means for doing so, we conclude that Utah Code section 78–14–7.1 does not violate article I, section 11 of the Utah Constitution.

## III. UNIFORM OPERATION OF LAWS

¶ 19 Judd next argues that section 78–14–7.1 violates the Utah Constitution's uniform operation of laws provision found in article I, section 24. This provision guards against discrimination within the same class and helps ensure that statutes establishing or recognizing rights for certain classes do so reasonably given the statutory objectives. *Malan v. Lewis,* 693 P.2d 661, 670–71 (Utah 1984). We employ heightened scrutiny under article I, section 24 when reviewing legislation that "implicates" rights under article I, section 11. *Lee,* 867 P.2d at 581. Sustaining legislation against an article I, section 24 challenge alleging that one's rights under the Open Courts Clause are constitutionally discriminated against requires the court to find that the challenged legislation "(1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal." *Id.* at 583. Although it causes great hardship for a small, severely injured group of plaintiffs, we find that the damage cap is reasonable, and it substantially furthers and is reasonably necessary to the legislative goal of decreasing health care costs and ensuring the continued availability of health care.

¶ 20 Judd's arguments before this court identify three important ways that the cap on quality of life damages might be unconstitutionally discriminatory. First, Judd notes that the limitation applies only to victims of medical malpractice, not to victims of other torts. Second, Judd points out that only medical malpractice victims with significant quality of life damages, as opposed to special damages, are affected. Last, Judd recognizes that the cap impacts only those who are most severely injured. We evaluate the damage cap under the heightened scrutiny

standard with reference to these classifications.

¶ 21 In connection with our discussion of the Open Courts Clause, *supra* ¶¶ 10–18, we determined that the damage cap was a reasonable method of implementing the legitimate legislative purpose of limiting health care costs and ensuring the continuing availability of health care resources. That discussion bears on this section as well. However, in order to sustain the damage cap under article I, section 24, a higher standard must be met. The cap on quality of life damages must be reasonably necessary to achieve the goals, and, in fact, actually and substantially further them.

¶ 22 As we recognized above in connection with our analysis under the Open Courts Clause, we do not proceed in our analysis under article I, section 24 as if we were called upon to answer these questions in the first instance. Instead, we carry out our role as the state's court of last resort, called upon to identify the boundaries of the constitution, giving appropriate deference to the policy choices of the citizens' elected representatives. Our review of the arguments and information presented by the parties and amici reveals that the cap meets the standard for constitutionality set by article I, section 24.

¶ 23 With regard to controlling health care costs, a report authored by Congress's Office of Technology Assessment evaluated six different empirical studies and concluded that "caps on damage awards were the only type of State tort reform that consistently showed significant results in reducing the malpractice cost indicators." *Impact of Legal Reforms, supra*, at 64. This reveals that such caps may be considered reasonably necessary to implement the legislature's policy of controlling malpractice insurance costs, and thus health care costs. However, the caps appear not only to be reasonably necessary, but to have an actual and substantial impact. This can be seen from a review of the actions and experiences of other states.

¶ 24 A study addressing California's experience with damage caps reported that "caps on noneconomic damages tend to be particularly effective in reducing costs be-

cause of the extreme variability of damage award[s] attributable to pain and suffering." LECG, Inc., *California's MICRA Reforms: How Would a Higher Cap on Non–Economic Damages Affect the Cost of and Access to Health Care?* 7 (1998) [hereinafter *California's MICRA Reforms*]. As the aforementioned Office of Technology Assessment report indicated, "[e]ven though caps on damages directly affect only a small minority of cases, this minority often accounts for a disproportionate share of total malpractice payments. In addition, it is the large, unexpected claim that makes it difficult for insurers to plan reserves." *Impact of Legal Reforms, supra*, at 64. Thus, Judd's unreasonableness argument, premised on the fact that there are relatively few claims in Utah subject to the cap, is not sufficiently compelling. It appears that the enactment of a cap allows sufficient quantification of quality of life damages to have a substantial impact on insurance rates.

¶ 25 The Board of Trustees of the American Medical Association has reported to its House of Delegates that the presence of a cap on noneconomic damages in California has stabilized local malpractice insurance rates at some of the lowest levels in the nation. American Medical Ass'n, *Report 35 of The Board of Trustees* 6 (2002). That same report compared the malpractice insurance rates paid by physicians in California to those paid by physicians in Nevada, where there was no cap on damages. Nevada physicians paid considerably more for comparable insurance than did California physicians—ranging from 42.8% higher premiums in the family and general practice field to 93% more in obstetrics and gynecology. *Id.* at 6–7. In short, there is sufficient evidence that caps on quality of life damages do have an actual impact on the cost of malpractice insurance.

¶ 26 The legislature also identified ensuring the continuing availability of health care resources as one of its purposes. Utah Code Ann. § 78–14–2 (2002). This concern appears to be equally as valid as, and related to, controlling costs. Nevada's recent experience illustrates the effect of high malpractice insurance rates on the availability of health

care resources. In July 2002, Las Vegas's only Level 1 trauma center closed. William Booth, *Las Vegas Trauma Center Closes as Doctors Quit*, Wash. Post, July 4, 2002, at A2. The closure of the trauma unit was precipitated by the resignation of virtually all of the facility's surgeons, who left because of the soaring cost of insuring themselves against malpractice. *Id.* After the closure, the nearest trauma center was 188 miles away from Las Vegas. *Id.* Nevada's experience, while extreme, is not unique. Doctors in other states reportedly have moved or given up their practices, at least in part because of rising malpractice insurance rates. *See* Mary Brophy Marcus, *Healthcare's "Perfect Storm"*, U.S. News & World Rep., July 1, 2002, at 39. While there is little indication that Utah faces an acute problem like Nevada's, the constitution does not compel the legislature to ignore such matters.

¶ 27 While the damage cap does indeed discriminate against medical malpractice victims with the most severe noneconomic injuries, it does so reasonably, given the statute's purpose. In order to control costs and provide for the continuing availability of health care resources, the legislature was faced with a number of choices. By deciding which reforms to enact, it necessarily discriminated. However, the classifications established by the statute meet the heightened scrutiny test.

¶ 28 Although the classifications deny some victims a full recovery while allowing such a recovery to others, the classifications are not unconstitutional. While medical malpractice victims are deprived of a measure of their remedy where other tort victims are not, enacting damage caps on all tort victims would be imprudent and overbroad given that the legislature's goal was to control *health care* costs. Additionally, although medical malpractice victims, those with primarily noneconomic, or quality of life, damages, are punished by the limitation when compared with those whose injuries are largely economic, this discrimination is permissible given the cap's purpose of controlling costs. As noted above, "caps on noneconomic damages tend to be particularly effective in reducing costs because of the extreme variability of damage award[s] attributable to pain and suffering." California's MICRA Reforms, *supra,* at 7. Thus, it appears there is support for the proposition that a large measure of the problem identified by the legislature results from fluctuation in cases with high noneconomic damages, and a cap which targets just those problems is therefore not unconstitutional. Because the crisis identified by the legislature is primarily precipitated by the potential for large, unpredictable judgments, establishing a cap that prevents only those types of judgments is reasonably necessary to achieve the legislative purpose, despite punishing the most severely injured victims.

¶ 29 When attempting to resolve problems of policy, the legislature is inevitably forced to draw lines. In this instance the legislature has chosen to enact a cap, limiting the right to recover quality of life damages to $250,000. This cap severely injures young Athan, who will live a life greatly diminished by Dr. Drezga's negligence. But that is a policy choice made by the legislative branch, and we cannot say that it is unconstitutional. The legislature's purpose in enacting the damage cap is a valid and legitimate one. The cap is a reasonably necessary means of achieving that purpose, and it actually and substantially furthers it. Therefore, the damage cap is permissible under article I, section 24 of the Utah Constitution.

## IV. DUE PROCESS

 ¶ 30 Next, Judd challenges the legislatively-imposed cap on quality of life damages on the ground that it violates Athan's right to due process under article I, section 7 of the Utah Constitution. Generally, we apply a rational basis test in substantive due process cases. *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 206 (Utah 1984). However, this rational basis test is replaced by a more stringent test in cases where the rights impacted by the legislation are deemed to be "fundamental." *Id.* Judd argues that we should use such heightened scrutiny in Athan's case. However, because article I, section 11 rights are not properly characterized as "fundamental," we will apply the rational basis test. *See Condemarin*, 775

P.2d at 359–60 (citing *Berry*, 717 P.2d at 677).

¶31 In harmony with our discussion in the sections above, we conclude that the cap on Athan's recovery of quality of life damages satisfies the rationality standard demanded by article I, section 7. The legislative concern with rising health care costs and fears about the continued availability of services are legitimate governmental issues. Finding that there was a problem to be remedied, the legislature enacted the damage cap as a targeted measure designed to minimize increases in costs and decreases in services. Far from the absolute cap invalidated in *Condemarin*, the cap on quality of life damages has no impact on a victim's recovery of damages for actual expenses, loss of earning capacity, or other economic measures of injury. Rather, it is limited to the one area where caps have proven effective—quality of life damages, which are difficult to predict but nevertheless must be accounted for by insurers. *California's MICRA Reforms, supra*, at 7. Far from being an arbitrary and unreasonable legislative response, then, section 78–14–7.1 represents the measured application of legislative tools to a real problem and is therefore constitutional under article I, section 7.

## V. RIGHT TO A JURY TRIAL

¶32 The Utah Constitution guarantees parties the right to a jury trial in a civil case. Utah Const. art. I, § 10; *Int'l Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.*, 626 P.2d 418, 420–21 (Utah 1981).[3] Judd argues that the cap on quality of life damages infringes this right because it prevents Athan from recovering an amount equal to the jury's determination of damages. We hold that the damage cap does not violate Athan's right to a jury trial.

¶33 There are essentially two lines of cases addressing whether a cap on damages deprives a victim of the right to a jury trial. Both lines of thinking are analytically simple and reasonable. One position is that the

jury's right to determine damages extends not only to a factual assessment of their amount, but also to an actual award of those damages. *See, e.g., Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711, 720–23 (1989) (holding damage cap unconstitutional because it invaded jury's right to determine damages). The other position is well-embodied in the case of *Etheridge v. Med. Ctr. Hosp.*, which notes that "although a party has the right to have a jury assess his damages, he has no right to have a jury dictate through an award the legal consequences of its assessment." 237 Va. 87, 376 S.E.2d 525, 529 (1989). We subscribe to the latter view.

¶34 As the *Etheridge* case correctly notes, it is the jury's duty to determine the amount of damages a plaintiff in fact sustained, but it is up to the court to conform the jury's findings to applicable law. *Id.* We recognize that damages are a question of fact, and that questions of fact are distinctly within the jury's province. *Ricks v. Budge*, 91 Utah 307, 64 P.2d 208, 213 (1937). However, the jury is always guided and constrained by the court through appropriate instructions. *Id.* ("While the law cannot ... determine with absolute certainty what damages, if any, plaintiff may be entitled to, still those are questions which a jury *under proper instructions from the court* must determine." (emphasis added)). The damage cap enacted by the legislature represents law, similar to an element of a claim to which the trial court must comport the jury's factual determinations.

¶35 Perhaps the most important reason behind the right to a jury trial is "to assure a fair and equitable resolution of factual issues." 50A C.J.S. *Juries* § 19 (1997). Athan's jury fulfilled this role when it determined, based on its view of the evidence, that his quality of life was diminished to the extent of $1,250,000. However, the law as enacted by the legislature does not provide for such an award, and the trial court was compelled to apply the law to the jury's verdict and reduce the award to $250,000. So structured, the damage cap does not violate

---

**3.** Article I, section 10, however, identifies only the right to jury trial in capital cases as "inviolate," and gives the legislature some authority to regulate other jury trials, at least as to the number of jurors.

Athan's right to a jury trial because it allows the jury to determine the facts in the first instance, before requiring the court to apply relevant law to the jury's verdict.

## VI. SEPARATION OF POWERS

¶ 36 Judd next argues that the damage cap violates article V, section 1 of the Utah Constitution, the separation of powers provision. The cap does so, Judd says, because it essentially allows the legislature to determine judicial controversies by fixing damages. We disagree.

¶ 37 We have recognized that judicial power is " 'the power to hear and determine controversies between adverse parties and questions in litigation.' " *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984) (quoting *Citizen's Club v. Welling*, 83 Utah 81, 27 P.2d 23, 26 (1933)). Judicial power is, however, constrained by the law enacted by the legislature. As one former member of this court put it, "[t]he power to declare what the law shall be is legislative. The power to declare what is the law is judicial." *Ritchie v. Richards*, 14 Utah 345, 47 P. 670, 675 (1896) (Bartch, J., concurring).

■■■ ¶ 38 There is a legitimate and long-established role for legislative involvement in jury trials. For example, the legislature establishes standards of proof, elements of torts and crimes, and otherwise controls much of the law upon which jury instructions are based. Given that extensive role in so many aspects of the jury trial process, it is incorrect to view the right to a jury determination of the facts of a case to be so broad as to prohibit any legislative involvement in the types and extent of damages that may be awarded. The damage cap represents law to be applied, not an improper usurpation of jury prerogatives. Consequently, it does not violate the separation of powers provision of the constitution.

**CONCLUSION**

¶ 39 We affirm the trial court's ruling limiting Athan's recovery of quality of life damages to $250,000 because the constitution does not prohibit it, despite its consequences to Athan.

¶ 40 The cap is designed to reduce health care costs, increase the availability of medical malpractice insurance, and secure the continued availability of health care resources—all legitimate legislative goals given the clear social and economic evil of rising health care costs and a shortage of qualified health care professionals. In attempting to meet its goals, the legislature has not unreasonably or arbitrarily limited recovery. Rather, it has chosen to place a limit on the recovery of "noneconomic" quality of life damages—one area where legislation has been shown to actually and substantially further these goals. Applying each individual test, we conclude that the open courts, uniform operation of laws, and due process provisions of our constitution are not offended by the damage cap. Additionally, neither the right to a jury trial nor the constitutional guarantee of separation of powers is offended by the cap. Affirmed.

¶ 41 Justice DURRANT and Justice PARRISH concur in Associate Chief Justice WILKINS' opinion.

DURHAM, Chief Justice, dissenting:

¶ 42 I respectfully dissent. The majority opinion analyzes the plaintiff's constitutional claims under the wrong standard of review and reaches the wrong result. The plaintiff has challenged the statute in question as a violation of due process, equal protection, the remedies clause of Utah's "open courts" provision, the separation of powers doctrine, and the right to a jury trial. Despite the protection each of these rights receives in the Utah Constitution,[1] and despite this court's clear precedent requiring a heightened standard of review in such challenges, the majority instead identifies a need for "deference to legislative judgments in a *Berry* review" and specifically rejects heightened scrutiny in fa-

---

1. The separation of powers requirement is found in article V of the Utah Constitution. The other

rights listed are protected in the "Declaration of Rights," article I of the Utah Constitution.

vor of a "rational basis" standard. In particular, the opinion ignores the majority holding of this court in *Wood v. University Medical Center* that "most, if not all, of [article I] rights have generated some form of heightened judicial scrutiny" and that "[n]otwithstanding the presumption of constitutionality we give to statutes, this court has consistently applied various forms of heightened review when article I rights are at issue." 2002 UT 134, ¶¶ 37–46, 67 P.3d 436. Under the proper standard of review, this statute fails. Because that result is required under sections 10 and 11 of article I, and under article V, I will discuss only the issues raised under those provisions.

## I. REMEDY BY DUE COURSE OF LAW

¶ 43 This court has analyzed section 11 claims using a "balancing" approach. *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 683 (Utah 1985). In *Berry*, as we later explained, we determined that legislative attempts to abrogate section 11 rights should "be closely examined by this Court and struck down when the disability they seek to impose on individual rights is too great to be justified by the benefits accomplished or when the legislation is simply an arbitrary and impermissible shifting of collective burdens to individual citizens." *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 358 (Utah 1989).

¶ 44 The collective burden this statue imposes on individual citizens is significant. To be clear about the nature of the capped damages at issue, noneconomic damages are real; they are intended to compensate victims of negligence for such things as chronic pain, disfigurement, and (as in this case) the loss of a normal life. The suggestion that they are somehow "soft" damages, or less quantifiable than economic damages, is, in my view, a red herring. Projected earnings and costs of future treatment and care, to name two typical elements of "economic" damages, are by no means exempt from uncertainty and the need for guesswork by juries (who regularly hear extensively from competing experts on these questions). Once one acknowledges the fact that noneconomic

damages, fully as much as economic ones, are truly compensatory, not "extras" or "freebies," for individual injured plaintiffs, the degree of the legislature's invasion of an individual's right under section 11 to a remedy is apparent.

¶ 45 Furthermore, I regard as extremely problematic the majority's wholesale acceptance of the rationale that, because damage awards for noneconomic damages are unpredictable, they are more acceptable targets for legislative diminution or destruction. The unpredictability of a jury's determination of the value of all losses, including noneconomic losses, has been, from the earliest beginnings of our tort system, an essential part of the deterrent function of tort law. One need go no further than the Ford Pinto case, where the evidence disclosed that Ford Motor had actually calibrated the relative costs of fixing its defective cars versus paying a few adverse verdicts—and opted to pay the verdicts—to be confronted with the flaw in the predictability argument. *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348, 360–62 (Ct.App.1981).

¶ 46 Lastly, the majority opinion takes insufficient account, I believe, of the arbitrary method by which the statute distributes the cost of its solution to the so-called malpractice crisis. The most seriously harmed plaintiff is likely to receive the smallest fraction of his or her actual damages, while the less injured are likely to receive much higher, or even total, compensation for the injuries they suffer. A more graphic illustration of the "impermissible shifting of collective burdens to individual citizens," *Condemarin*, 775 P.2d at 358, is hard to imagine, and it is the most vulnerable and voiceless citizens who bear the brunt of this shift.

¶ 47 Against this extreme cost to the few victims whose injuries and suffering are severe and perhaps (as with this plaintiff) lifelong is to be considered the legislature's rationale for inflicting such damage on individual rights. The majority defers entirely to the legislature's "fact-finding" process and cites rather extensively to specific sources supporting the legislature's conclusions that high jury verdicts are the major cause of high medical malpractice premi-

ums. This conclusion is entirely inconsistent with Utah's long experience with juries in these cases. Utah juries are demonstrably reluctant to award high pain and suffering awards. In fact, according to the most recent statistics from the National Practitioner Data Bank, Utah ranks fiftieth among all the states and the District of Columbia in the median size of verdicts awarded in malpractice cases. This fact undermines the notion that jury verdicts have anything to do with premiums in this state. N.P.D.B. Ann. Rep. tbl.9 (2002), *available at* http://www. npdb-hipdb.com/pubs/stats/2002_NPDB_Annual Report.pdf. While we owe deference to legislative judgments on policy questions generally, we do not grant immunity to constitutional review on the basis of legislative assertions of "fact" that have no demonstrated basis in reality. No one would claim, for example, that if the legislature "determined," contrary to well-established scientific evidence, that childhood vaccinations caused autism, it could properly impose negligence liability on medical practitioners administering the vaccines.

¶ 48 In addition to its uncritical acceptance of the legislature's perception that high jury verdicts in Utah are the cause of the problem this statute purports to address, the majority fails to acknowledge the numerous recent studies attributing rises in insurance premiums to phenomena within the insurance industry itself, rather than to the size of jury verdicts. *See* app. A. Discussing his landmark Harvard study on medical malpractice, Paul Weiler notes the critical limitations of available evidence in determining the relationship between medical malpractice litigation and insurance premiums and the inherent unfairness and high social cost of damage caps as a response in the absence of any showing of their effectiveness. Paul Weiler, *Medical Malpractice on Trial* 7–16, 56–61 (1991); *see also* Thomas B. Metzloff, *Understanding the Malpractice Wars*, 106 Harv. L.Rev. 1169, 1177–87 (1993) (book review). Weiler's New York-based study was reproduced in Utah and Colorado with significantly similar results. David M. Studdert & Troyen A. Brennan, *Beyond Dead Reckoning: Measures of Medical Injury Burden,*

*Malpractice Litigation, and Alternative Compensation Models from Utah and Colorado* 33 Ind. L.Rev. 1643, 1677 (2000). Another author points out that emerging data severely undermine the traditional view of the causes of the so-called medical malpractice "crisis":

As much as the [traditional] hypothesis concerning the roots of the malpractice crisis makes intuitive sense, recent studies have shown that it is simply not accurate. Rather, these studies (discussed below) demonstrate that it is the economy, and not an increase in litigation, which accounts for the various malpractice crises. However, these studies go further and attack the traditional perspective as rhetoric propagated by the insurance industry and foisted upon the medical community and public as an excuse for skyrocketing rates....

These studies, performed by a coalition of nearly 100 consumer groups around the country entitled "Americans for Insurance Reform" ("AIR"), are perhaps most surprising for their conclusion that there has historically been no relation between malpractice payouts and premiums. Contrary to the cause and effect supposition discussed above, the AIR studies found that over the past thirty years, the amount that medical malpractice insurers have paid out (including jury awards as well as settlements) directly tracks the rate of medical inflation. Thus, despite the alarms rung as a result of the breakdown of the traditional doctor-patient relationship and the increased media attention paid to medical mistakes and jury verdicts, this has not translated to a resulting explosion in payouts to medical malpractice claimants.

Premiums, the studies found, are a different story. Rather than correspond to payouts, they rise and fall in direct relation to the state of the economy. More specifically, premiums rise when interest rates fall. Examining the two prior malpractice crises (which occurred in the mid 1970s and mid 1980s respectively), the studies found that the crises occurred during years of a weakened economy and falling interest rates. Although each crisis

brought attempts at malpractice reform in many states, it only subsided when the economy finally recovered and interest rates rose.[2]

Mitchell J. Nathanson, *It's the Economy (and Combined Ratio), Stupid: Examining the Medical Malpractice Litigation Crisis Myth and the Factors Critical to Reform*, 108 Penn. St. L.Rev. 1077, 1081–82 (2004).

¶ 49 Given the extensive debate and the lack of empirical or expert consensus on the cause of increasing insurance costs, the legislature, however persuaded it may be by one set of assertions, may not properly deprive individual victims of their constitutional right to receive jury-determined compensation for their losses in the absence of overwhelming evidence that the public interest can only be protected by the deprivation. Such a state of affairs currently does not exist; indeed, many thoughtful experts have propounded numerous responses to the situation that would involve no infringement of constitutional rights of citizens. *See, e.g.,* Weiler, *supra,* at 93–161; *see also* sources referenced in appendix B. The insistence of our past jurisprudence in this area that the legislature provide some substitute remedy, some quid pro quo, speaks to the high burden borne by those who seek to justify a statute like this. That burden has not been met here. In essence, the majority concludes that the constitutional rights at issue here are so negligible that any "reasonable" need identified by the legislature is sufficient to permit their destruction. I disagree. As we said in *Berry,* the basic purpose of article I, section 11 is "to impose some limitation on that power for the benefit of those persons who are injured in their persons, property, or reputations since they are generally isolated in society, belong to no identifiable group, and rarely are able to rally the political process to their aid." 717 P.2d at 676.

## II. RIGHT TO JURY TRIAL

¶ 50 Article I, section 10 of the Utah Constitution guarantees the right to a jury trial in civil cases. The majority suggests that this guarantee does not protect the right to benefit from the result of a jury trial, but only the process of having one. On this theory, the legislature could establish maximum (or minimum) recoveries in virtually every civil case without implicating the nature of the underlying right to jury trial. Such an argument, in my view, is absurd. Thomas Jefferson said, "I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." 3 *The Writings of Thomas Jefferson* 71 (H.A. Washington ed., 1861), *quoted in Parklane Hosiery v. Shore,* 439 U.S. 322, 344 n. 10, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting). Speaking of the jury's fundamental role in our legal structure, the United States Supreme Court has observed: "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to the judiciary." *Parklane,* 439 U.S. at 343, 99 S.Ct. 645. Even earlier, in 1935, the Court stated that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935).

¶ 51 In *International Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.,* 626 P.2d 418 (Utah 1981), we described the institution of civil jury trial as "deeply rooted in our basic democratic institutions and so important in the administration of justice, not only as a buffer between the state and the sovereign citizens of the state, but also as a means for rendering justice between citizens." *Id.* at 420. Of what use is such a right if the legislature has the power to nullify the jury's function by imposing arbi-

---

**2.** I am aware that the majority opinion has cited studies supporting contrary inferences from the data. That fact illustrates my point. How are the courts to fulfill their roles as guardians of the rights guaranteed in our constitution when the legislature posits certainty where it obviously does not exist, relies on that so-called certainty as a basis for contravening those rights, and then demands deference to its enactments?

trary limits on the jury's impact on the result of a case? Presumably, if the legislature declared that, in actions for defamation, any damages awarded by the jury should be reduced to the sum of $1.00, the majority, under its logic here, would uphold the statute as not affecting the right to a jury trial. Likewise, I suppose, if the legislature enacted a statute providing that whenever a jury returned a verdict for plaintiffs in any tort action, the verdict was to be reduced to zero and the claim dismissed, the majority might conclude that the trial court was merely applying the "law" to a jury finding rather than intruding on the process of a jury trial in violation of the Utah Constitution.

¶ 52 This court declared as early as 1896 that the determination of damages, including noneconomic damages, is part and parcel of the function of the civil jury:

> The amount which the injured party ought to recover is referred to the sound discretion of the jury; and the elements or factors which should be taken into consideration are the plaintiff's injured feelings and tarnished reputation, the nature of the imputation, and the character, condition, and influence of the parties as they may be shown by the evidence.

*Fenstermaker v. Tribune Publ'g Co.*, 13 Utah 532, 45 P. 1097, 1099 (1896).

¶ 53 It is thus clear that the constitutional right to a jury trial fully included the jury's determination of damages. "In cases of tort, like the one at bar, it is one of the fundamental principles of the law that the injured party is entitled to recover fair and adequate compensation" in the form of damages. *Rosenthal v. Harker*, 56 Utah 113, 189 P. 666, 667 (1920). And, "[w]hen the matter of damages is in dispute, it is an issue upon which the parties are entitled to a jury trial, the same as on other disputed issues of fact." *Mel Hardman Prods., Inc. v. Robinson*, 604 P.2d 913, 918 (Utah 1979). "The amount to be awarded in a particular case is a question to be determined by the jury according to the particular facts and circumstances, under appropriate instructions given by the court." *Rosenthal*, 189 P. at 667.

¶ 54 Our constitution thus protects as inviolate the right to a jury trial. That right includes, as *Fenstermaker* makes clear, the power to determine noneconomic damages. 45 P. at 1099. By the enactment of so-called "caps" on compensatory damages, the legislature has attempted to substitute a "one-size-fits-all" level of compensation for serious injuries, regardless of the particular facts and circumstances of individual cases.

¶ 55 The Washington Supreme Court, construing a similar provision in its constitution, concluded that " '[t]o the jury is consigned under the constitution the ultimate power to weigh the evidence and determine the facts—and the amount of damages in a particular case is an ultimate fact.' " *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711, 716–17 (1989) (quoting *James v. Robeck*, 79 Wash.2d 864, 490 P.2d 878, 881 (1971)). "The jury's role in determining noneconomic damages is perhaps even more essential." *Id.* The *Sofie* court went on to point out that

> in Kansas, Texas, Ohio, and Florida, states that have found the damages limit unconstitutional, the operative language of the right to jury trial provisions in those states' constitutions [as in Utah's] is nearly identical to our own. Cases upholding damage limits either have not analyzed the jury's role in the matter or have not engaged in the historical constitutional analysis used by this court in construing the right to a jury.

*Id.* at 723 (citations omitted). *Sofie* got it right.

¶ 56 *Sofie* also got it right when it distinguished *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525, 529 (1989), on which the majority relies here:

> [The dissent] cites with approval the recent case of *Etheridge*, but ignores the greater number of cases from other jurisdictions that support our [majority's] position. In making this oversight, [the dissent] also omits the fact that four courts whose decisions support [the majority's] holding—Texas, Kansas, Ohio, and Florida—base their decisions on state constitutions with operative language nearly identical to our own. Moreover, the Virginia constitution, upon which *Etheridge* is based, contains language quite different

from ours or of the other states mentioned above. The *Etheridge* opinion is also poorly reasoned. After conceding that the "jury's fact-finding function extends to the assessment of damages," the court finds that a "trial judge applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function." Thus, supposedly, the limitation does not infringe on the jury's function.

As this court [has] stated ...: "The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name...." In other words, a constitutional protection cannot be bypassed by allowing it to exist in form but letting it have no effect in function.

*Sofie*, 771 P.2d at 724 (citations omitted).

¶ 57 Since *Sofie* was decided, Alabama and Oregon, also states with constitutional language similar to ours,[3] have followed the same rationale as *Sofie* in striking damage caps. *Moore v. Mobile Infirmary Ass'n*, 592 So.2d 156, 164 (Ala.1991); *Lakin v. Senco Prods., Inc.*, 329 Or. 62, 987 P.2d 463, 473 (1999).

¶ 58 The appellee in this case has argued that the availability of judicial remittitur undermines the notion that the right to jury determination of damages is part of a constitutionally inviolate guarantee. I will deal with remittitur in the following section, which focuses on separation of powers, but once again reference the Washington Supreme Court's treatment of this argument in *Sofie:* (1) Remittitur belongs to the judicial branch and is applied only after careful, case-specific review of the evidence; it is not an arbitrary, automatic, sweeping legislative reduction of damages. (2) There are well-developed guidelines for the imposition of remittitur, requiring strong presumptions in favor of jury verdicts. These guidelines require that the verdict be wholly unsupported by the evidence, motivated by passion or prejudice, or shocking to the court's conscience. (3) Perhaps most critically, the opposing party in cases of remittitur has the choice of accepting the reduction or seeking a new trial. *Sofie*, 771 P.2d at 720–21. The legislative cap includes none of these protections designed to give maximum deference to jury verdicts.

¶ 59 In *Condemarin*, I left open the question, not before us in that case, whether a damage cap on noneconomic damages could survive constitutional scrutiny under article I, section 10. 775 P.2d at 366 (opinion of Durham, J.). I now conclude that it cannot. The legislature has improperly invaded the right to jury trial of plaintiffs with noneconomic damages by rendering jury verdicts irrelevant in cases where the harm to victims of negligence is greatest.

## III. SEPARATION OF POWERS

¶ 60 As noted above, the power to reduce jury verdicts, under certain limited circumstances, has always belonged to the judicial branch of government. The doctrine of remittitur—the process by which the damages awarded by the jury are reduced—has been an inherently judicial power for almost two centuries. *See, e.g., Dimick v. Schiedt*, 293 U.S. 474, 483, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Hansen v. Boyd*, 161 U.S. 397, 412, 16 S.Ct. 571, 40 L.Ed. 746 (1896). In *Dimick* the Court carefully examined the origins of remittitur in the English common law and in American law. It observed that, "since the decision of Mr. Justice Story in 1822, this court has never expressed doubt in respect of the rule, and it has been uniformly applied." 293 U.S. at 483, 55 S.Ct. 296. The Court also noted that remittitur of an excessive jury

---

**3.** Article I, section 10 of the Utah Constitution states:

> In capital cases the right of trial by jury shall remain inviolate.... In other cases, the Legislature shall establish the number of jurors by statute, but in no event shall a jury consist of fewer than four persons. In criminal cases the verdict shall be unanimous. In civil cases three-fourths of the jurors may find a verdict. A jury in civil cases shall be waived unless demanded.

Utah Const. art. I, § 10. While the language in this provision is less straightforward than the respective right to jury trial provisions in the constitutions of Alabama, Washington, and Oregon, its use of the word "inviolate" is important. *Cf.* Ala. Const. art. I, § 11; Or. Const. art. I, § 17; Wash. Const. art. I, § 21. This court has stated that the right to jury trial is considered inviolate in criminal and civil cases as well. *See State v. Black*, 551 P.2d 518, 520 (Utah 1976); *Int'l Harvester Credit Corp.*, 626 P.2d at 419–20.

verdict is a question of law for the court. *Id.* at 486, 55 S.Ct. 296.

¶ 61 Utah courts have recognized and practiced remittitur since at least 1888. *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 804 n. 16 (Utah 1991). Utah law allows a court to reduce the jury's award of damages if "[s]uch an award is so excessive as to be shocking to one's conscience and to clearly indicate passion or prejudice, and it abundantly appears that there is no evidence to support or justify the verdict." *Stamp v. Union Pac. R.R. Co.*, 5 Utah 2d 397, 303 P.2d 279, 282 (1956). Remittitur serves as a check on the jury system and promotes both the administration of justice and the conclusion of litigation. *Id.* at 283.

¶ 62 This court has emphasized, however, that "[j]uries are generally allowed wide discretion in the assessment of damages." *Cruz v. Montoya*, 660 P.2d 723, 726 (Utah 1983). There is no set formula to determine noneconomic damages such as pain and suffering, so " '[t]he permissible minimum and maximum limits within which a jury may operate for a given injury are presently far apart and must continue to be widespread so long as pain and suffering must be measured by money standards.' " *Stamp*, 303 P.2d at 282 (quoting *Duffy v. Union Pac. R.R. Co.*, 118 Utah 82, 218 P.2d 1080, 1084 (1950)). The absolute right to a jury determination of civil damages and its importance have already been discussed.

¶ 63 Historically and at present, trial courts are given deference in permitting remittiturs because the trial judge is present during all aspects of the trial and can therefore best determine whether the jury acted with "passion or prejudice" in awarding damages. *Crookston*, 817 P.2d at 804. The trial judge is not given absolute discretion in allowing a remittitur; he "must be able to articulate a reasonable basis for the inappropriateness of the verdict" and must adhere to the limitations set forth in *Stamp*. *Id.* at 813 n. 31. The deference given to a jury verdict and trial judge because of their unique perspective during the presentation of the case is evidence that remittiturs should be considered and granted on a case-by-case basis where abundant evidence of passion or preju-

dice exists. By mandating a unilateral damage cap in all medical malpractice cases, the legislature has ignored the specific noneconomic injuries present in each case, disregarded the deliberation of the jury in the context of the evidence, and discriminated against the most severely injured plaintiffs.

¶ 64 The damage cap essentially functions as a "legislative remittitur," undercutting the responsibility and power properly belonging to the judiciary to determine whether a jury's verdict is excessive. *Best v. Taylor Mach. Works*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1079–80 (1997). As such, the cap is simply a "legislative attempt to mandate legal conclusions" and clearly violates the separation of powers provision. *Sofie*, 771 P.2d at 721.

¶ 65 Even trial courts, with full judicial authority, do not have the power to remit damages without the consent of the parties. An important condition to the remittitur of a jury verdict is the consent of both parties to the reduced amount. If one or both of the parties refuse to accept the remittitur, "he or she may elect to retry the matter." *Crookston*, 817 P.2d at 813. The legislative damage cap thus forces plaintiffs to forego fully-determined jury awards as well as their right to opt for a new trial in lieu of the remittitur. *See* Paul B. Weiss, *Reforming Tort Reform: Is There Substance to the Seventh Amendment?*, 38 Cath. U.L.Rev. 737, 756–57 (1989).

¶ 66 The judicial power "to hear and determine controversies between adverse parties and questions in litigation" includes essential and primary functions regarding damages such as remittitur. *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984) (quoting *Citizens' Club v. Welling*, 83 Utah 81, 27 P.2d 23, 26 (1933)). As the majority opinion states, "[t]he power to declare what the law shall be is legislative. The power to declare what is the law is judicial." *Ritchie v. Richards*, 14 Utah 345, 47 P. 670, 675 (1896) (Barch, J., concurring). But the judicial branch also has the power and duty to invalidate laws enacted by the legislature that are unconstitutional, including those acts that violate the separation of powers doctrine defined in article V, section

1. *In re Handley's Estate*, 15 Utah 212, 49 P. 829, 830–31 (1897). The damage cap represents more than simply law to be applied; it is an unconstitutional attempt by the legislature to exercise by statute the inherently judicial function of remitting noneconomic damage awards. This it may not do.

## CONCLUSION

¶ 67 Notwithstanding the preeminent role in policymaking that belongs to the legislature, this court's responsibility to uphold the individual rights guaranteed by the Utah Constitution requires us from time to time to scrutinize legislative choices regarding the implementation of policy to ensure that they do not violate those rights. The mandatory cap on noneconomic damages contained in Utah Code section 78–14–7.1 violates the right to a remedy for personal injury under article I, section 11 and the right to a jury trial under article I, section 10 of the Utah Constitution. It also violates the fundamental principle of separation of powers by invading the province of the jury in a manner that belongs historically and inherently to the judiciary.

¶ 68 Justice NEHRING concurs in Chief Justice DURHAM's dissenting opinion.

## APPENDIX A

Press Release, Sen. Edward M. Kennedy, Statement in Opposition to the Medical Malpractice Amendment (July 26, 2002), *available at* http://www.senate.gov/~kennedy/statements/02/07/2002730306.html.

Harming Patient Access to Care: The Impact of Excessive Litigation: Hearing Before the House Subcomm. on Health of the Comm. on Energy and Commerce, 107th Cong. (2001) (statement of Travis Plunkett, Legislative Director, Consumer Fed'n of America).

Americans for Insurance Reform, *Medical Malpractice Insurance: Stable Losses/Unstable Rates 2004*, at 3–8, *available at* http://www.centerjd.org/air/StableLosses04.pdf.

Congress Watch, *Medical Misdiagnosis: Challenging the Malpractice Claims of the Doctors' Lobby* (2003), *available at* http://www.citizen.org.

Patricia M. Danzon, *Medical Malpractice: Theory, Evidence, and Public Policy* 103–07 (1985).

Jean Hellwege, *Med–Mal Caps in Two States Don't Reduce Insurance Rates*, Trial, Feb. 2004, at 14–16.

J. Robert Hunter & Joanne Doroshow, *Premium Deceit: The Failure of Tort Reform to Cut Insurance Prices* (1999), *available at* http://www.insurance-reform.org/Premium-Deceit.pdf.

Sylvia Law & Steven Polan, *Pain and Profit: The Politics of Malpractice* 161–64 (1978).

Frank M. McClellan, *Medical Malpractice: Law, Tactics and Ethics* 76 (1994).

U.S. Gov't Accountability Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates* 8–10 (2003), *available at* http://www.gao.gov/new.items/d04128t.pdf.

Paul C. Weiler, *Medical Malpractice on Trial* 8–11 (1991).

Paul C. Weiler et al., *A Measure of Malpractice: Medical Injury, Malpractice Litigation, and Patient Compensation* 3 (1993).

Jay Angoff, *The Truth About Med–Mal Premiums: A Former Insurance Commissioner Explains How the Current "Crisis" Came to Be and What We Can Do About It*, Trial, May 2004, at 36–43.

Thomas P. Breutsch, *The Legislature "Caps" the Jury: Damage Caps and the Michigan Constitution*, 1 J.L. Soc'y 151, 177–78 (1999).

Patricia J. Chupkovich, *Statutory Caps: An Involuntary Contribution to the Medical Malpractice Insurance Crisis or a Reasonable Mechanism for Obtaining Affordable Health Care?*, 9 J. Contemp. Health L. & Pol'y 337, 340 (1993).

Nancy L. Manzer, *1986 Tort Reform Legislation: A Systematic Evaluation of Caps on Damages and Limitations on Joint and Several Liability*, 73 Cornell L.Rev. 628, 629–32 (1988).

David J. Nye & Donald G. Gifford, *The Myth of the Liability Insurance Claims Explosion:*

*An Empirical Rebuttal,* 41 Vand. L.Rev. 909, 922 (1988).

Kathleen E. Payne, *Linking Tort Reform to Fairness and Moral Values,* 1995 Detroit C.L.Rev. 1207, 1221–24.

Frank A. Sloan, *State Responses to the Malpractice Insurance "Crisis" of the 1970's: An Empirical Assessment,* 9 J. Health Pol. Pol'y & Law 629 (1985).

Martin D. Weiss et al., *Medical Malpractice Caps: The Impact of Non–Economic Damage Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage* 5–6 (2003), *available at* http://www.weissratings.com/MedicalMalpractice.pdf.

Rachel Zimmerman & Christopher Oster, *Insurers' Price Wars Contributed to Doctors Facing Soaring Costs,* Wall St. J., June 24, 2002, at A1.

APPENDIX B

Congress Watch, *Medical Misdiagnosis: Challenging the Malpractice Claims of the Doctors' Lobby* (2003).

Institute of Medicine, *To Err Is Human: Building a Safer Health System* 3–6 (Linda Kohn et al. eds., 1999).

Sylvia Law & Steven Polan, *Pain and Profit: The Politics of Malpractice* 206–14 (1978).

Am. Law Inst., *Reporters' Study,* 2 Enterprise Resp. For Personal Injury (1991).

Paul C. Weiler, *Medical Malpractice on Trial* 115–16 (1991).

Am. Med. Ass'n, *Report 35 of the Board of Trustees* 3 (2002), *available at* http://www.ama-assn.org/ama1/upload/mm/annual02/bot35a02.rtf.

Mitchell J. Nathanson, *It's the Economy (and Combined Ratio), Stupid: Examining the Medical Malpractice Litigation Crisis Myth and the Factors Critical to Reform,* 108 Penn. St. L.Rev. 1077, 1078–82 (2004).

Kathleen E. Payne, *Linking Tort Reform to Fairness and Moral Values,* 1995 Detroit C.L.Rev. 1207, 1244.

David M. Studdert & Troyen A. Brennan, *Beyond Dead Reckoning: Measure of Medical Injury Burden, Malpractice Litigation,*

*and Alternative Compensation Models from Utah and Colorado,* 33 Ind. L.Rev. 1643, 1671–76 (2000).

Martin D. Weiss et al., *Medical Malpractice Caps: The Impact of Non–Economic Damage Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage* 5–6 (2003), *available at* http://www.weissratings.com/MedicalMalpractice.pdf.