2002 UT 55

Ron PARKS and Cindy Parks,
Plaintiffs and Appellants,

v.

UTAH TRANSIT AUTHORITY, a
Utah governmental corporation,
Defendant and Appellee.

No. 991023.

Supreme Court of ·Utah.

June 14, 2002.

David R. Olsen, Paul M. Simmons, Salt Lake City, for plaintiffs.

Jan Graham, Att'y Gen., Brent A. Burnett, Asst. Att'y Gen., Jody K. Burnett, Daniel S. McConkie, Salt Lake City, for defendant.

John P. Soltis III, Salt Lake City, for amicus Salt Lake County.

HOWE, Justice:

## INTRODUCTION

¶ 1 In this wrongful death case, the parents of the deceased, plaintiffs Ron and Cindy Parks, appeal from an amended judgment they obtained against defendant Utah Transit Authority (UTA) that had been reduced by the trial court from $785,000 to $250,000 pursuant to section 63-30-34 of the Utah Code, which imposes a cap on damages in actions against governmental entities.

## BACKGROUND

¶ 2 Dustin Parks was traveling west in his automobile on 4500 South in Salt Lake County. A UTA bus was traveling east on 4500 South, intending to turn left on 500 East. As the traffic light for east-west traffic turned yellow, the bus turned left in front of Dustin. His car struck the right front of the bus, killing him.

¶ 3 At trial, the jury found UTA negligent and returned a verdict awarding general damages of $387,500 to each plaintiff and $10,000 in special damages. A judgment was entered for that amount. Subsequently, UTA moved to limit the total amount of the judgment to $250,000 based on section 63-30-34(1)(a) and (b) of the Utah Governmental Immunity Act (the Act). In a memorandum decision, the trial court held that UTA's activities "were governmental, as opposed to proprietary," and thus fell within the scope of the Act. It further explained that in reaching its conclusion, it had considered "the overall operations" of UTA, not the specific activity UTA was engaged in at the time of the accident. It held that a $250,000 per person limit, not a $500,000 per occurrence limit, applied and entered an amended order reducing the total judgment to $250,000. Plaintiffs appeal from the reduced judgment, assailing it on several grounds including constitutional challenges.

## STANDARD OF REVIEW

¶ 4 Determining the constitutionality of a statutory provision is a question of law, which this court reviews for correctness, granting no deference to the trial court's conclusion. *Provo City Corp. v. Willden,* 768 P.2d 455, 456 (Utah 1989). The interpretation of a statute also presents a question of law, which this court reviews for correctness. *State v. James,* 819 P.2d 781, 796 (Utah 1991).

## ANALYSIS

¶ 5 Plaintiffs contend that the damage cap imposed by section 63–30–34 of the Utah Code violates various provisions of the Utah Constitution. Alternatively, plaintiffs assert that the cap should be interpreted to allow each of them to recover $250,000. We will address each issue separately.

### I. ARTICLE I, SECTION 11

¶ 6 Plaintiffs contend that by imposing a damage cap of $250,000 in this case, the legislature has violated article I, section 11 of the Utah Constitution, which provides in relevant part: "All courts shall be open, and every person, for an injury done to him in his person, ... shall have remedy by due course of law...." Plaintiffs argue that prior to 1987, under our case law, UTA's operation would have been held to have been a proprietary function as opposed to a governmental function. Governmental entities engaged in proprietary functions did not come within the scope of the Act with its provision for a cap on damages. *See, e.g., Dalton v. Salt Lake Suburban Sanitary Dist.,* 676 P.2d 399 (Utah 1984) (holding that the one-year statute of limitations provided for in section 63–50–11 does not apply to actions arising from proprietary functions). However, in 1987, the legislature amended section 63–30–2(4)(a) to make all activities of governmental entities governmental functions. Thus the damage caps in the Act limited governmental entities' liability for their negligence. Consequently, plaintiffs further argue, by placing a cap on the amount of damages they can recover, the legislature has diminished and eroded the remedy plaintiffs enjoyed before the 1987 amendment. This, their argument continues, is not constitutionally permissible unless the requirements of the two-part test enunciated by this court in *Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985), are met.

■ ¶ 7 It is unnecessary for us to here determine whether the 1987 amendment passes the scrutiny of the *Berry* test because we conclude that prior to the 1987 amendment, UTA's operation would have been held to have been a governmental function, and consequently, its liability would have been limited by the damage cap provision of the Act. Plaintiffs' contention that UTA's operation would have been classified as a proprietary function prior to the 1987 amendment is bottomed on their assertion that UTA operates a bus service that historically has been provided by private companies with whom UTA competes, that UTA produces revenue from its bus operations, and that UTA seeks to make a profit. To adequately answer this assertion, we must examine the essence of UTA's creation and operation.

¶ 8 For the purposes of this case, we will assume that prior to the 1987 amendment, the operation of a public transportation system by a governmental entity would have been classified as a proprietary function. *See* 63 C.J.S. *Municipal Corporations* § 813 (1999) (noting a split of authority on that point). However, UTA's genesis and the scope of its operation and activities are vastly different from traditional urban public transportation systems operated by municipalities. UTA was established as a political subdivision known as a "public transit district" pursuant to sections 17A–2–1001 to –1064 of the Utah Public Transit District Act. In section 17A–2–1002, the legislature identified the necessity and public policy in support of establishing public transit districts:

The legislature hereby finds and declares:

(1) that the predominant part of the state's population is located in its rapidly expanding metropolitan and other urban areas which generally cross the boundary lines of local jurisdictions and often extend into two or more counties;

(2) that usage of present public urban transit systems has been declining while cost of operation has been increasing, so that present public transit systems have been forced to curtail services rendered, and their plans and equipment have been deteriorating with the result that they are unable to provide the type of service needed by citizens and are unable to plan, establish and coordinate area-wide metropolitan public transit systems;

(3) that the welfare and vitality of urban areas, the satisfactory movement of people within these areas, the lessening of traffic congestion and the effectiveness of hous-

ing, tourist, highway and other governmental programs, are being jeopardized thereby; and

(4) that the problems involved in adequately furnishing public urban transportation for the present and future needs of the people of the state are of such magnitude and complexity that the various urban transit systems, municipalities and counties acting individually, lack the ability, finances and jurisdiction to resolve, establish and coordinate urban transportation. Therefore, it is essential to establish a public agency known as a transit district which can operate in its own right and authority and exercise jurisdiction without being restricted to municipal corporate or county limits, governed by representatives of the governmental units lying within the district. It is the purpose of this part to provide the means necessary for mass transportation of persons presently and in the future.

Utah Code Ann. § 17A–2–1002.

¶ 9 UTA provides transit services for 61 political jurisdictions, serving approximately 1,650,000 people over 1,400 square miles in Utah, Tooele, Salt Lake, Davis, Weber, and Box Elder Counties. In addition to scheduled bus operations, it provides light rail operations and expensive Flextrans services catering to the needs of the disabled.

¶ 10 For the ten-year period from 1989 to 1998, an average of 78.5% of UTA's total revenues came from public financing, including a combination of state sales taxes and federal grants. In 1998, 79.5% of revenues came from sales tax or federal sources and only 14.5% from operating revenues. Other income was made up of interest, property sales, and other nonoperating transactions. UTA's capital expenditures are generally funded by federal grants covering 75 to 80% of costs.

¶ 11 Plaintiffs rely heavily on *Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989), for the proposition that UTA should be treated like University Hospital, as a proprietary or non-core governmental function. We note that *Condemarin* was a plurality opinion in which three justices, each of whom wrote separate opinions, reached the same result but did not all agree on the legal basis for that conclusion. *Condemarin* addressed the proprietary and governmental distinction in relation to University Hospital, but it did not do so in a manner that could be practically applied to any other governmental entity. As a result, there is limited precedential value to that opinion. Three justices concurred in the narrow holding of that opinion as encapsulated in one sentence, "[T]he holding of the Court is limited to the following: the recovery limits statutes are unconstitutional as applied to University Hospital." *Condemarin,* 775 P.2d at 366.

¶ 12 *Condemarin* is distinguishable from the present case on its material facts. Only 3.5% of the University Hospital's operating budget came from legislative appropriations, less than one-fourth of the cost of construction came from state sources, with the rest coming from private subscriptions and contributions, and the hospital was "practically self-supporting." *Condemarin,* 775 P.2d at 373–74. The hospital also competed directly with other hospitals, and any financial burden imposed on it for its negligence could be met in the same way as do private hospitals. *Id.*

¶ 13 Unlike University Hospital, UTA is not practically self-supporting and would not survive on income from its revenue-producing activities. Additionally, UTA does not compete with existing private bus lines. In fact, UTA is statutorily prohibited from competing directly with private transportation providers.[1]

¶ 14 Thus the realities of operating a transit system as does UTA are that no private entity can provide capital or operating funds to establish a system with the variety of services and of the size and scope operated by UTA unless under legislative mandate.

1. The district may not establish directly or indirectly, any public transit service or system or acquire facilities necessary or incidental thereto in manner or form that may divert, lessen, or compete for the patronage or revenues of a preexisting system of a publicly or privately owned public carrier furnishing like services without the consent of the public or private carrier.
Utah Code Ann. § 17A–2–1017.

Accordingly, we hold that UTA's operation would have been considered to have been a governmental function prior to the passage of the 1987 amendment and not a proprietary function. UTA's liability to the plaintiffs was therefore not diminished by the 1987 amendment. UTA's liability to the plaintiffs is subject to the provisions of the Governmental Immunity Act, including its limitation on damages. Article I, section 11 of the Utah Constitution has not been violated.

## II. ARTICLE XVI, SECTION 5

■ ¶ 15 The plaintiffs contend that the damage cap in section 63–30–34 violates article XVI, section 5 of the Utah Constitution, which provides:

> The right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law.

Utah Const. art. XVI, § 5. In *Tiede v. State,* 915 P.2d 500 (Utah 1996), this court addressed whether article XVI, section 5 precluded application of the Act in a wrongful death action against the State. We held that it did not, observing that when the state constitution was adopted, there was no express constitutional or statutory authority allowing suits for wrongful death against the State. We concluded that the Act "does not abrogate any previously existing right of action and therefore does not violate article XVI, section 5." *Id.* at 504.

¶ 16 While in the instant case, the State is not being sued, but UTA, a political subdivision instead, the same result follows because we have earlier determined in this opinion that UTA performs a "governmental function" as that term was defined prior to the 1987 amendment to section 63–30–2(4)(a) (which made all government activities "governmental functions"), and thus would have been entitled to immunity for its negligent acts.

■ ¶ 17 There is an additional reason why article XVI, section 5 is not violated. The prohibition against any limitation on the amount recoverable is subject to an exception, i.e., "in cases where compensation for injuries resulting in death is provided by law." That exception applies here where the legislature has in the Act fixed the plaintiffs' remedy. In the absence of the Act, governmental immunity would have prevailed, and plaintiffs would have had no recovery.

## III. REMAINING CONSTITUTIONAL CHALLENGES TO DAMAGE CAP PROVISION

■ ¶ 18 Plaintiffs challenge the constitutionality of the damage cap statute under various sections of article I of the Utah Constitution: (1) the due process provision in section 7, (2) the uniform operation of laws provision in section 24, and (3) the right to a jury trial provision in section 10. We have addressed the constitutionality of section 63–30–34 under each of these provisions in previous cases and have repeatedly upheld the statute. *See Lyon v. Burton,* 2000 UT 19, ¶¶ 33–43, 5 P.3d 616 (holding damage cap provisions constitutional under article I, sections 11 and 24 in judgment arising from firefighting activities); *Bott v. DeLand,* 922 P.2d 732, 743 (Utah 1996) (noting that the damage cap provisions are constitutional under article I, sections 7, 10, 11, and 24 as applied to judgments for injuries resulting from performance of governmental functions), *overruled in part on other grounds* by *Spackman v. Bd. of Educ. of Box Elder County Sch. Dist.,* 2000 UT 87, 16 P.3d 533; *McCorvey v. Utah State Dep't of Transp.,* 868 P.2d 41, 48 (Utah 1993) (holding damage cap constitutional under article I, sections 7, 10, 11 and 24 for injuries arising from negligence in performing a governmental function). We eschew the invitation to revisit these decisions, and we uphold the constitutionality of the statute under these constitutional provisions.

## IV. IMMUNITY OF UTA EMPLOYEES

Section 63–30–4(4) provides in relevant part:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no em-

ployee shall be held personally liable for acts or omissions occurring during the performance of the employee's duties ... unless it is established that the employee acted or failed to act due to fraud or malice.

Utah Code Ann. § 63–30–4(4).

¶ 19 Plaintiffs complain that the above statute prohibits them from bringing suit against the bus driver for his alleged negligence in causing the accident that took the life of their son. They recognize that this court upheld the constitutionality of section 63–30–4(4) against a constitutional challenge under article I, section 11 in *Payne v. Myers*, 743 P.2d 186, 190 (Utah 1987). In that case, we upheld the constitutionality of that statute because while it prohibited the plaintiffs from suing the employees of the State, the Governmental Immunity Act waived the immunity of the State and allowed the plaintiffs to recover against the State for the negligence of the State's employees. *Id.* It is true, as pointed out by the plaintiffs in this case, that this court did not there discuss the reality that any recovery against the State would be subject to the damage caps, whereas in a suit against state employees there would not be that limitation on damages.

¶ 20 This issue was raised and decided in *Lyon v. Burton*, 2000 UT 19, 5 P.3d 616. In a split decision, this court upheld the constitutionality of section 63–30–4(4) even though the legislature had replaced the right to sue a state employee for unlimited damages with the right to sue the state for damages, albeit the damages recoverable were subject to the damage cap. *Id.* at ¶¶ 44–50. We decline to reconsider that decision now.

## V. CONSTRUCTION OF SECTION 63–30–34

■ ¶ 21 The plaintiffs contend that each of them was damaged by the wrongful death of their son, and thus each are entitled to $250,000 in damages. Section 63–30–34(1) provides:

(a) Except as provided in Subsections (2) and (3), if a judgment for damages for personal injury against a governmental entity ... exceeds $250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence, the court shall reduce the judgment to that amount.

(b) A court may not award judgment of more than $250,000 for injury or death to one person regardless of whether or not the function giving rise to the injury is characterized as governmental.

Utah Code Ann. § 63–30–34(1)(1999).[2]

■ ¶ 22 The trial court determined that the legislature, in enacting section 63–30–34(1)(b) intended to "limit the amount of recovery for the death of any one person to the amount of $250,000, regardless of the number of people who were damaged as a result of the death." In reviewing that conclusion, we presume that the legislature used each word advisedly, and we give effect to each word according to its commonly accepted meaning. *Versluis v. Guar. Nat'l Cos.*, 842 P.2d 865, 867 (Utah 1992).

¶ 23 Subsection 63–30–34(1)(a) states that "if a judgment ... exceeds $250,000 *for* one person in any one occurrence, or $500,000 *for* two or more persons in any one occurrence," the court shall reduce the judgment to that amount. (Emphasis added.) The meaning of that subsection is not entirely clear and arguably could be read to support the plaintiffs' contention if the words "$250,000 for one person" means one person (such as a plaintiff) who is entitled to recover and "$500,000 for two or more persons" means two or more persons who are entitled to recover. However, when subsection 1(b) is considered, that ambiguity is cleared up because the "one person" referred to there clearly means the person who has been subjected to injury or death. It specifically limits judgments to "$250,000 for injury or death *to* one person." (Emphasis added.) Subsection (1)(b) was added in 1991 as a

---

2. The limitations amounts in subsection (1)(a) were recently amended effective July 1, 2000, to "$500,000 for one person in any one occurrence, or $1,000,000 in damages for two or more persons in any one occurrence" and in subsection

(1)(b) to $500,000. *See* 2000 Utah Laws ch. 57, § 2. That amendment does not apply in the instant case because the plaintiffs' son was killed in 1995.

legislative amendment and makes clear that when one person suffers injury or death, only $250,000 may be awarded irrespective of the number of persons who have been damaged because of the injury or death.

## CONCLUSION

¶ 24 Judgment affirmed.

¶ 25 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE'S opinion.