2005 UT 30

Andrea TINDLEY, individually; John Sabodski, individually; Andrea Tindley and John Sabodski for the Estate of Eric Sabodski; David Horman, individually; Susan Horman, individually; David and Susan Horman for the Estate of Jeff Horman; Brian Horman, a minor, by and through his natural parents David Horman and Susan Horman; Erin Anderson; and Matt Ehrman, Plaintiffs and Appellants,

v.

SALT LAKE CITY SCHOOL DISTRICT, Defendant and Appellee.

No. 20030581.

Supreme Court of Utah.

May 17, 2005.

George Waddoups, Lawrence D. Buhler, Ralph C. Petty, Timothy C. Houpt, Salt Lake City, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Barry G. Lawrence, Asst. Att'ys Gen., for defendant.

PARRISH, Justice:

¶ 1 This appeal concerns the constitutionality of section 63–30–34 of the Utah Governmental Immunity Act, which limits the damages recoverable in actions against the state or its political subdivisions.[1] Plaintiffs brought this action against the Salt Lake City School District (the "District"), asserting that the limitation violates both the Utah and the United States Constitutions. The District successfully moved for summary judgment. Plaintiffs appealed. We affirm.

## BACKGROUND

¶ 2 David Smith was employed by the District as a teacher and debate team coach at Highland High School in Salt Lake City, Utah. Smith selected eight students, including Erin Anderson, Matt Ehrman, Brian and Jeff Horman, and Eric Sabodski, to compete in a debate tournament at the University of Southern California ("USC"). The tournament began on Friday, November 3, 2000, and concluded the following Sunday. Each student competing in the tournament paid a portion of the costs to attend, with the remaining costs paid by funds raised through the high school debate club.

¶ 3 Intending to drive the team to USC, Smith reserved a fifteen-passenger van from a rental agency. When Smith arrived at the rental agency, however, he learned that the van he had reserved was unavailable. Consequently, Smith rented two minivans to transport the students to the competition. District employee and assistant debate team coach Christian Bradley drove one of the vans, while Smith drove the other.

¶ 4 The debate team arrived at USC and participated in both the preliminary and the elimination rounds of the competition. Following the elimination rounds on Sunday afternoon, the team began the return trip to Salt Lake City. Bradley left at approximately 1:00 p.m., driving one of the rented minivans, with Eric, Jeff, Erin, Brian, and Matt as passengers. Smith followed shortly thereafter with the remaining students. Late that evening, while traveling through Millard

---

1. In 2004, the legislature repealed the Governmental Immunity Act, codified at Utah Code Ann. §§ 63–30–1 to –38 (1997 & Supp.2003). In its place, the legislature enacted the Governmental Immunity Act of Utah, codified at Utah Code Ann. §§ 63–30d–101 to –904 (2004). Pursuant to the provisions of the new act, all injuries alleged to have been caused by a governmental entity before July 1, 2004, are governed by the former act. Because the events at issue here occurred before that date, all references in this opinion to the limitation on judgments imposed by the Governmental Immunity Act are to the former act. While the limitation of judgments provision in the new act increases the amount of the limitation and provides a mechanism for its future adjustment based on the consumer price index, the basic structure of the limitation has not changed.

County, Utah, Bradley lost control of the minivan due to his own negligence. The vehicle flipped several times, ejecting Eric, Jeff, and Erin.

¶ 5 Eric and Jeff were killed in the accident, and the remaining three students were seriously injured. Erin sustained numerous injuries, including a severe traumatic brain injury. Brian's injuries included crushed vertebrae and a fractured hand and foot, and Matt suffered an injury to his knee, as well as multiple contusions and abrasions. It is uncontested that plaintiffs' aggregate damages exceeded $500,000.

¶ 6 Recognizing its liability for Bradley's negligence, the District and its insurer, the Utah State Division of Risk Management, entered into a settlement agreement with plaintiffs Erin, Brian, Matt, and the parents and estates of Eric and Jeff. Under the settlement agreement, the District agreed to pay plaintiffs collectively $500,000, the maximum amount then recoverable under the Utah Governmental Immunity Act. In exchange, plaintiffs agreed to relinquish their rights to pursue any claims against the District or its employees, but reserved the right to challenge the constitutionality of the damage cap imposed by the Governmental Immunity Act.

¶ 7 In accordance with the settlement agreement, plaintiffs filed suit in district court, alleging that the cap violates several provisions of the Utah Constitution, including the open courts clause, as well as the provisions guaranteeing due process, uniform operation of laws, and the right to recover damages for injuries resulting in death. Plaintiffs also alleged that the cap violates the equal protection guarantee of the United States Constitution.

¶ 8 The District filed a motion for summary judgment, urging the district court to reject plaintiffs' constitutional challenges to the cap. Plaintiffs responded with a cross-motion for summary judgment. The district court granted the District's motion for summary judgment, finding the cap constitution-

al and dismissing plaintiffs' claims with prejudice. This appeal followed.

## ANALYSIS

¶ 9 Historically, the ability to sue the State of Utah or one of its political subdivisions rested on a determination of whether the governmental entity was protected by the common law doctrine of sovereign immunity. That changed in 1965, when the Utah Legislature enacted the Utah Governmental Immunity Act (the "Act"), which barred all causes of action against the state and its political subdivisions unless expressly authorized by statute. Specifically, the Act provided that "all governmental entities," including school districts, "are immune from suit for any injury which results from the exercise of a governmental function." Utah Code Ann. §§ 63–30–2(3), (7), –3(1) (1997 & Supp.2000). Despite its broad grant of immunity, the Act expressly waived immunity for "injury proximately caused by a negligent act or omission of an employee committed within the scope of employment." *Id.* § 63–30–10 (1997). Judgments obtained pursuant to this waiver, however, were limited. The Act provided that

if a judgment for damages for personal injury against a governmental entity, or an employee whom a governmental entity has a duty to indemnify, exceeds $250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence, the court shall reduce the judgment to that amount.

*Id.* § 63–30–34.

¶ 10 Plaintiffs argue that this statutory limitation on judgments violates article I, section 11 of the Utah Constitution, commonly referred to as the open courts clause. Plaintiffs also argue that the cap violates the due process and uniform operation of laws provisions of the Utah Constitution, as well as the equal protection guarantee of the United States Constitution. Finally, plaintiffs assert that the cap violates article XVI, section 5 of the Utah Constitution, which guarantees the right to recover damages for injuries resulting in death.[2]

---

2. In her opening brief, plaintiff Andrea Tindley also argued that the cap violates the separation of powers provision of the Utah Constitution,

article V, section 1, and that the cap effectively abridged her right to a trial by jury as guaranteed by article I, section 10 of the Utah Constitu-

¶ 11 "The issue of '[w]hether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court.'" *Grand County v. Emery County*, 2002 UT 57, ¶ 6, 52 P.3d 1148 (quoting *State v. Daniels*, 2002 UT 2, ¶ 30, 40 P.3d 611). Moreover, as this court has recognized, the challenged statute "is presumed constitutional, and we resolve any reasonable doubts in favor of constitutionality." *Utah Sch. Bds. Ass'n v. State Bd. of Educ.*, 2001 UT 2, ¶ 9, 17 P.3d 1125 (internal quotations omitted). Because we conclude that plaintiffs have failed to demonstrate that the cap violates either the Utah or the United States Constitution, we affirm the summary judgment entered in favor of the District.

## I. THE OPEN COURTS CLAUSE: ARTICLE I, SECTION 11 OF THE UTAH CONSTITUTION

¶ 12 We first address plaintiffs' claim that the cap violates the open courts clause found in article I, section 11 of the Utah Constitution. That provision provides:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

Utah Const. art. I, § 11.

¶ 13 The open courts clause is not merely a procedural protection. Rather, this court has held that the open courts clause provides citizens of Utah the "right to a remedy for an injury." *Judd ex rel. Montgomery v. Drezga*, 2004 UT 91, ¶ 10, 103 P.3d 135. In *Laney v. Fairview City*, 2002 UT 79, 57 P.3d 1007, we declared that "the plain meaning of the [open courts clause] 'imposes some *substantive* limitation on the legislature['s ability] to abolish judicial remedies in a capricious fashion.'" *Id.* at ¶ 30 (quoting

*Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 33, 974 P.2d 1194 (Stewart, J., concurring)). In *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), we stated that

the basic purpose of Article I, section 11 is to impose some limitation on [the legislature's] power for the benefit of those persons who are injured in their persons, property, or reputations since they are generally isolated in society, belong to no identifiable group, and rarely are able to rally the political process to their aid.

*Id.* at 676. In other words, the open courts clause provides more than procedural protections; it also secures substantive rights, thereby restricting the legislature's ability to abrogate remedies provided by law.

¶ 14 The District asks us to overrule this interpretation of the open courts clause, first announced in the *Berry* decision. Under the doctrine of stare decisis, the District assumes the "substantial burden" of convincing us that "the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." *Laney*, 2002 UT 79 at ¶ 45, 57 P.3d 1007 (internal quotations omitted).

¶ 15 We recently have declined similar invitations to overrule the *Berry* interpretation. For instance, in *Laney*, we held that *Berry* was not erroneously decided; rather, its "analytical model ... was established only after a thorough analysis of Utah's case law regarding the open courts provision and the case law and history of other states with similar provisions." *Id.* at ¶ 46. Additionally, we opined that overruling *Berry's* interpretation of the open courts clause "can only do harm to our constitution and to the delicate balance of process it creates." *Id.* at ¶ 47; *see also Judd*, 2004 UT 91 at ¶ 11, 103 P.3d 135 ("The Attorney General invites us to disavow our *Berry* line of cases.... This we decline to do.").

tion. Because Tindley failed to raise these claims below, we decline to address them. *See Espinal v. Salt Lake City Bd. of Educ.*, 797 P.2d 412, 413 (Utah 1990) ("With limited exceptions,

the practice of this court has been to decline consideration of issues raised for the first time on appeal.").

¶ 16 The District nevertheless suggests that we should abandon *Berry's* interpretation of the open courts clause because several states have adopted a definition contrary to ours when interpreting similar provisions. Although the District has taken great care in detailing the states that have adopted this differing view, we previously have stated, and now reaffirm, that the meaning of our open courts clause is not dependent upon another state's interpretation of a similar provision. Rather, "we should rely on our own state history and precedent to determine the purpose and meaning of article I, section 11's protection." *Laney*, 2002 UT 79 at ¶ 32, 57 P.3d 1007. Because the District has failed to meet its burden of demonstrating either that *Berry* was erroneously decided or that a change in conditions now makes its holding unsound, we decline its invitation to overrule *Berry*.

■ ¶ 17 Although the open courts clause protects both substantive and procedural rights, the clause is not an absolute guarantee of all substantive rights. Rather, it applies only to legislation which "abrogates a cause of action existing at the time of its enactment." *Id.* at ¶ 50. The legislature thus remains free to abrogate or limit claims that could not have been brought under then-existing law. Claims barred by the doctrine of governmental immunity are an example of this principle. In *DeBry v. Noble*, 889 P.2d 428 (Utah 1995), we noted that "the scope of the protections afforded by article I, section 11 [have] to be viewed in light of the immunities that were recognized when the Utah Constitution was adopted," including "governmental immunity." *Id.* at 435; *see also Madsen v. Borthick*, 658 P.2d 627, 629 (Utah 1983) ("Article I, § 11 worked no change in the principle of sovereign immunity, and sovereign immunity is not unconstitutional under that section.").

■ ¶ 18 In addition, the mere fact that legislation abrogates an existing legal remedy does not render it impermissible under the open courts clause. Such legislation is acceptable under *Berry* so long as it either "provides an injured person an effective and reasonable alternative remedy" or seeks to eliminate "a clear social or economic evil."

717 P.2d at 680. With respect to the second alternative, "the [abrogation] of an existing legal remedy [cannot be] an arbitrary or unreasonable means for achieving the objective." *Id.*

■ ¶ 19 The District argues that the doctrine of sovereign immunity rendered it immune from suit prior to the passage of the Act. Accordingly, it reasons that the Act could not have abrogated any "existing remedy" in violation of the open courts clause. Plaintiffs urge us to reject this conclusion for two reasons. First, plaintiffs argue that the doctrine of sovereign immunity was not part of Utah law at the time the Utah Constitution was adopted. Second, even assuming that sovereign immunity was part of Utah law, they assert that it protected governmental entities only when those entities were performing activities constituting a governmental function, *Lyon v. Burton*, 2000 UT 19, ¶ 36, 5 P.3d 616, and that transporting students to an out-of-state, extracurricular debate tournament does not qualify as such. We decline plaintiffs' invitation to revisit the historical evolution of sovereign immunity under Utah law because we conclude that the District would have been entitled to immunity for its activity in this case prior to the adoption of the Act.

¶ 20 Before the enactment of the Act in 1965, governmental entities were afforded immunity to the extent that their activities qualified as governmental functions. *See id.* (noting that prior to the Act's enactment, "governmental activities deemed to be proprietary were not immune and governmental activities deemed to be 'governmental' as opposed to proprietary were immune"). With certain exceptions, the Act codified this view of sovereign immunity, providing all governmental entities immunity for "the exercise of a governmental function." Utah Code Ann. § 63–30–3(1); *see Greenhalgh v. Payson City*, 530 P.2d 799, 801 (Utah 1975) ("It seems plain enough that the intent of [the Act] was to retain the then existing law, both as to immunity and as to liability ...."), *superseded on other grounds by* Utah Code Ann. § 78–12–36(1) (Supp.1975). However, because the Act did not define "governmental function," the question of whether an activity

fell within the scope of the Act rested with the courts. *See Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1232 (Utah 1980), *superseded by* Utah Code Ann. § 63–30–2(4)(a) (1987). This changed in 1987 when the legislature amended the Act, defining a governmental function as follows:

> any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons.

Utah Code Ann. § 63–30–2(4)(a).

¶ 21 The 1987 amendment substantively expanded the scope of immunity established by the Act, providing immunity for activities that were once deemed proprietary and, therefore, had not been covered by immunity under the common law. *See Laney*, 2002 UT 79 at ¶ 53, 57 P.3d 1007 ("By defining a governmental function as any act of a governmental entity, whether or not the activity is characterized as governmental or proprietary, the 1987 amendment effectively grants immunity protection for some activities that were formerly considered proprietary and were not entitled to immunity."). Accordingly, to determine whether the Act, or its 1987 amendment, "abrogates a cause of action existing at the time of its enactment," *id.* at ¶ 50, we must determine whether plaintiffs would have had a right to bring their cause of action against the District at any time prior to 1987. If not, the Act does not abrogate an existing remedy, thereby terminating our analysis. If, however, plaintiffs would have been able to bring suit against the District prior to 1987, we must then determine whether the Act's abrogation of that cause of action is permissible under *Berry*.

█ ¶ 22 Our jurisprudence has established a distinct test, based on our opinion in *Standiford*, for determining whether the Act in its current form abrogates a cause of action that existed prior to its enactment.

Under this test, we assess whether the activity giving rise to the cause of action is " 'of such a unique nature that it can only be performed by a governmental agency or that ... is essential to the core of governmental immunity.' " *Laney*, 2002 UT 79 at ¶ 52, 57 P.3d 1007 (quoting *Standiford*, 605 P.2d at 1236–37); *see Lyon*, 2000 UT 19 at ¶ 35, 5 P.3d 616 (recognizing that the *Standiford* test "reflect[s] the proper constitutional boundary between those governmental activities that" implicate the open courts clause and those that do not).

¶ 23 We previously have noted that the *Standiford* test must be applied with a "degree of flexibility" in order to take into account the "significant differences between different kinds of governmental activities." *DeBry*, 889 P.2d at 440. Thus, in applying this test, we must, " 'among other things, evaluate whether the effect of tort liability would promote public safety or defeat essential or core governmental activities and programs that are critical to the protection of public safety and welfare.' " *Lyon*, 2000 UT 19 at ¶ 39, 5 P.3d 616 (quoting *DeBry*, 889 P.2d at 440). In our previous applications of the *Standiford* test, we have concluded, for example, that a city's "operation and maintenance of a municipal electrical power system" was not sufficiently unique to have qualified for immunity under the pre–1987 version of the Act, *Laney*, 2002 UT 79 at ¶¶ 22–53, 57 P.3d 1007; "that fire fighting activities are an essential and core governmental activity," *Lyon*, 2000 UT 19 at ¶ 42, 5 P.3d 616; and that a city's "operation of a public golf course is not essential to governing," *Standiford*, 605 P.2d at 1237.

¶ 24 We have long recognized the essential nature of public schools' educational activities. *See Bingham v. Bd. of Educ.*, 118 Utah 582, 223 P.2d 432, 434 (1950) (recognizing that school districts act " 'on behalf of the state in discharging the duty of educating the children of school age in the public schools created by general laws' " (quoting *Woodcock v. Bd. of Educ.*, 55 Utah 458, 187 P. 181, 183 (Utah 1920))). While the act of providing classroom instruction lies at the heart of a school district's function, any supplemental activities that are necessary to sustain this

function must similarly be subject to the same rule. This principle is consistent with our previous recognition that the scope of a school board's immunity, prior to the enactment of the Act, extended to its operation of an incinerator to dispose of garbage collected on school grounds. *Id.* at 438.

¶ 25 Here, we are unwilling to conclude that a school's operation of an extracurricular student debate team, including its transport of the team to and from out-of-state competitions, falls outside the realm of a school district's core activities. Such an activity clearly benefits student education and is unlikely to be available to public school students if not offered through their schools. Moreover, imposing tort liability on a school district for the operation of such activities is more likely to deter schools from offering them than to promote public safety. We note that other jurisdictions have consistently held that similar extracurricular activities fall within the scope of a public school's traditional governmental immunity. *See, e.g., Yanero v. Davis,* 65 S.W.3d 510, 527 (Ky.2001) (interscholastic athletics); *Churilla v. Sch. Dist.,* 105 Mich.App. 32, 306 N.W.2d 381, 381 (1981) (football program); *McManus v. Anahuac Indep. Sch. Dist.,* 667 S.W.2d 275, 278 (Tex.Ct.App.1984) (school-sponsored bonfire and pep rally).

¶ 26 We conclude that school districts have always enjoyed governmental immunity for the operation of such programs as the one at issue. Thus, the Act did not in any way limit or abrogate a right to recover from the District. *See McCorvey v. Utah Dep't of Transp.,* 868 P.2d 41, 48 (Utah 1993) ("Because no right existed at common law to recover from the state for injuries arising out of the state's maintenance of public roadways, the legislature is free to limit the state's liability in that area without implicating the open courts clause...."). Accordingly, we hold that the Act's limitation on damages does not violate the open courts provision of the Utah Constitution.

## II. UNIFORM OPERATION OF LAWS AND DUE PROCESS UNDER THE UTAH CONSTITUTION AND EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION

¶ 27 We now address whether the Act violates either the uniform operation of laws provision, article I, section 24,[3] or the due process provision, article I, section 7,[4] of the Utah Constitution. Because both provisions seek to accomplish the same objective, namely, to ensure that legislation is "rationally related to the accomplishment of some legitimate state purpose," our analysis of the two provisions will contain "[considerable] overlap." *Condemarin v. Univ. Hosp.,* 775 P.2d 348, 356 (Utah 1989) (internal quotations omitted).

¶ 28 When evaluating a challenge under the uniform operation of laws provision, commonly referred to as Utah's equal protection clause, we subject statutory classifications that involve fundamental rights or suspect classifications to a "heightened degree of scrutiny." *Utah Safe to Learn–Safe to Worship Coalition, Inc. v. State,* 2004 UT 32, ¶ 31, 94 P.3d 217. Additionally, we review statutory classifications that implicate rights protected by the open courts clause under "heightened scrutiny." *Judd,* 2004 UT 91 at ¶ 19, 103 P.3d 135; *see also Lee v. Gaufin,* 867 P.2d 572, 580–82 (Utah 1993) (holding that "a standard of scrutiny stricter than the rational-basis standard governed when a discrimination implicated a right protected by the open courts provision"). However, when a statute does not create a suspect classification and implicates neither a fundamental right nor a right protected by the open courts clause, we will subject that statute to a lower level of scrutiny, analyzing the statute to determine " '(1) whether the classification is reasonable, (2) whether the legislative objectives are legitimate, and (3) whether there is a reasonable relationship between the two.' " *Peterson v. Coca–Cola USA,* 2002 UT 42, ¶ 23, 48 P.3d 941 (quoting

---

**3.** Article I, section 24 provides that "[a]ll laws of a general nature shall have uniform operation." Utah Const. art. I, § 24.

**4.** Article I, section 7 provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7.

*Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 426 (Utah 1995)).

¶ 29 Similarly, under the due process clause, a statute that does not infringe upon a fundamental right is subject only to rational basis review and will be upheld if it has " 'a reasonable relation to a proper legislative purpose, and [is] neither arbitrary nor discriminatory.' " *Condemarin*, 775 P.2d at 356 (quoting *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940 (1934)). Fundamental rights are "those rights which form an implicit part of the life of a free citizen in a free society." *Utah Pub. Employees' Ass'n v. State*, 610 P.2d 1272, 1273 (Utah 1980). "The catalog of fundamental interests is relatively small to date, and includes such things as the right[s] to vote, to procreate and to travel interstate." *Id.* The right to sue in tort a school district or any other governmental entity engaging in a governmental function does not qualify as such a fundamental right. *See Bingham*, 223 P.2d at 438 (holding that because "the acts complained of were committed in the performance of a governmental function, the rule of immunity applies"); *see also McCorvey*, 868 P.2d at 48 ("There is no fundamental right to recover unlimited damages from government entities performing governmental functions." (internal quotations omitted)).

¶ 30 Because the Act implicates neither a fundamental right nor a right protected by the open courts clause, the lower, or rational basis, level of scrutiny governs our analysis of plaintiffs' equal protection and due process claims. In prior cases, we applied that level of scrutiny to the Act's limitation on individual damages and concluded that the limitation violates neither the equal protection provision nor the due process provision of the Utah Constitution. *See Parks v. Utah Transit Auth.*, 2002 UT 55, ¶ 18, 53 P.3d 473 (noting that we have "addressed the constitutionality of section 63–30–34 under each of these provisions [article I, section 7 and article I, section 24] in previous cases and have repeatedly upheld the statute"); *McCorvey*, 868 P.2d at 48 (concluding that the Act was not "unconstitutional as applied" because it did not "infringe on a fundamental right"). As we stated in *Parks*, "[w]e eschew the invitation to revisit these decisions, and we uphold the constitutionality of the [individual cap] under these constitutional provisions." 2002 UT 55 at ¶ 18, 53 P.3d 473.

¶ 31 Anticipating our decision to uphold the cap on individual damages based on our prior decisions, plaintiffs nonetheless urge us to hold that the aggregate cap of $500,000 "for two or more persons in any one occurrence" violates the equal protection and due process provisions of the Utah Constitution. Because both the due process and uniform operation of the laws provisions require that we evaluate the governmental purpose of the legislation, *see Condemarin*, 775 P.2d at 356, we first examine the objective of the aggregate cap before determining its constitutionality under those provisions.

¶ 32 The District maintains, and we have acknowledged, that the damage cap was intended to preserve the treasuries of the state and its political subdivisions. *See id.* at 361. By limiting the damages payable by governmental entities, the Act protects an entity's operating budget from the possibility of substantial damage awards and the financial havoc they may wreak. We find this to be a legitimate governmental purpose. Although we recognize that the aggregate cap may impose significant financial and emotional burdens on those injured by a governmental entity, it is not our province to rule on the wisdom of the Act or to determine whether the Act is the optimal method for achieving the desired result. Rather, our inquiry is limited to the Act's constitutionality. *See Judd*, 2004 UT 91 at ¶ 15, 103 P.3d 135 ("Our job as this state's court of last resort is to determine whether the legislature overstepped the bounds of its constitutional authority . . ., not whether it made wise policy in doing so.").

¶ 33 Having identified the cap's legitimate objective, we now address whether the aggregate cap satisfies the additional requirements of Utah's equal protection and due process guarantees. Under our equal protection analysis, a statute is constitutional if its classification is "a reasonable one and bears a reasonable relationship to the achievement of a legitimate legislative pur-

pose." *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 890 (Utah 1988). We conclude that the classifications inherent in the aggregate cap are both reasonable and reasonably related to accomplishing the Act's objective of protecting the fiscal resources of governmental entities.[5] Damages arising from multiple-victim accidents resulting in personal injury are extremely difficult to predict and have a much greater potential than any single-victim accident for giving rise to a judgment that could drastically deplete the resources of a governmental entity. A judgment in favor of numerous plaintiffs against a small municipality for damages resulting from a catastrophic event could have a devastating impact on the municipality's fiscal health. The aggregate cap protects against such a result by limiting the damages the municipality can be required to pay to multiple victims.[6] Although we acknowledge that the legislature could have selected a less severe means to achieve this objective, the level of scrutiny we employ in this case does not require the statute to embody the best solution. *See Condemarin*, 775 P.2d at 386 (Hall, C.J., dissenting). Consequently, we hold that the aggregate cap satisfies the demands of equal protection.

¶ 34 We reach a similar conclusion with respect to plaintiffs' claims under the due process clause. As stated above, a statute does not offend due process if it has a "reasonable relation to a proper legislative purpose, and [is] neither arbitrary nor discriminatory." *Id.* at 352 (internal quotations omitted). As recognized in our equal protection analysis, the aggregate cap is reasonably related to a legitimate governmental objective. Accordingly, we hold that the aggregate cap also satisfies the demands of due process.

¶ 35 Plaintiffs further assert that the cap violates the guarantee of equal protection found in the Fourteenth Amendment to the United States Constitution. In discussing the relationship between Utah's uniform operation of laws provision and the federal equal protection provision, "we have made clear that Utah's uniform operation of the laws provision is 'at least as exacting, and in some circumstances, more rigorous than the standard applied under the federal constitution.'" *Whitmer v. City of Lindon*, 943 P.2d 226, 230 (Utah 1997) (quoting *Mountain Fuel*, 752 P.2d at 889); *see also Carrier v. Pro–Tech Restoration*, 944 P.2d 346, 356 (Utah 1997) (declaring that, under a rational basis review, "the protection afforded by article I, section 24 is at least as rigorous as that provided by the United States Constitution"). Because the Act does not violate plaintiffs' rights under article I, section 24 of the Utah Constitution, it also "will pass federal muster." *Whitmer*, 943 P.2d at 230 (internal quotations omitted).

## III. THE RIGHT TO RECOVER DAMAGES FOR WRONGFUL DEATH, ARTICLE XVI, SECTION 5 OF THE UTAH CONSTITUTION

¶ 36 The final issue we address is whether the Act violates the right to recover damages for injuries resulting in death, as

---

5. Plaintiffs identify several such classifications. They include classifications between (1) victims in a multiple-victim accident and victims in a single-victim accident; (2) less seriously and more seriously injured victims; (3) victims injured by governmental, as opposed to private, tortfeasors; and (4) victims who have suffered personal injury, as opposed to injury to their property.

6. The apparent legislative purpose of limiting losses and increasing the predictability of damage awards appears identical to the purpose of limits on liability found in most private insurance contracts. Like the limitation on damages imposed by the Act, private contracts governing liability insurance typically provide for one limit of liability for bodily injury to or death of one person and a separate, aggregate limit of liability for bodily injury to or death of two or more persons arising out of a single incident. Applicable provisions of Utah insurance law are consistent with such an approach. *See* Utah Code Ann. § 31A–22–304(1) (2003) (establishing motor vehicle liability policy minimum limits of $25,000 for "bodily injury to or death of one person" and $50,000 for "bodily injury to or death of two or more persons ... in any one accident"). In a practical sense, plaintiffs' inability to recover from the District for the full extent of their loss in this case is not unlike the situation they would have faced had the accident arisen from the negligence of an entity with limited resources that was covered by a contract of private liability insurance with a relatively low aggregate limit of liability.

guaranteed by article XVI, section 5 of the Utah Constitution. That provision provides that "[t]he right of action to recover damages for injuries resulting in death[ ] shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law." Utah Const. art. XVI, § 5. As with the uniform operation of laws and due process issues, we decided this issue in *Parks,* holding that "the Act 'does not abrogate any previously existing right of action and therefore does not violate article XVI, section 5.' " 2002 UT 55 at ¶ 15, 53 P.3d 473 (quoting *Tiede v. State Dep't of Corr.,* 915 P.2d 500, 504 (Utah 1996)). In *Parks,* we noted an additional reason the Act did not violate article XVI, section 5: "The prohibition against any limitation on the amount recoverable is subject to an exception, i.e., 'in cases where compensation for injuries resulting in death is provided by law.' That exception applies here where the legislature has in the Act fixed the plaintiffs' remedy." *Id.* at ¶ 17 (quoting Utah Const. art. XVI, § 5). Because plaintiffs have failed to distinguish *Parks* from this case, we find *Parks* controlling and decline to depart from our holding therein.

## CONCLUSION

¶ 37 In conclusion, we hold that section 63–30–34 of the Utah Code is constitutional as applied to plaintiffs. Specifically, the limitation on damages found in the Utah Governmental Immunity Act does not violate the open courts clause, the due process provision, or the uniform operation of laws provision of the Utah Constitution. Similarly, the limitation is inconsistent with neither federal guarantees of equal protection nor the right under the Utah Constitution to recover damages for injuries resulting in death. We therefore affirm the summary judgment entered in favor of the District.

¶ 38 Chief Justice DURHAM, Justice DURRANT, Justice NEHRING, and Judge LAYCOCK concur in Justice PARRISH's opinion.

¶ 39 Having disqualified himself, Associate Chief Justice WILKINS does not participate herein; District Judge CLAUDIA LAYCOCK sat.