2007 UT 99

**Celeste MOSS, an heir of Bradley A. Rone, Plaintiff and Appellant,**

v.

**PETE SUAZO UTAH ATHLETIC COMMISSION, Utah Department of Commerce, and State of Utah, et al., Defendants and Appellees.**

No. 20060438.

Supreme Court of Utah.

Dec. 21, 2007.

Robert B. Sykes, Ryan B. Evershed, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Debra J. Moore, Barry G. Lawrence, Sandra L. Steinvoort, Asst. Att'ys Gen., Salt Lake City, for defendants.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Bradley Rone died during a boxing match. His sister and heir, Celeste Moss, seeks to recover damages from the Pete Suazo Utah Athletic Commission (the "Athletic Commission") for allowing Rone to fight. The question before us is whether the Athletic Commission is immune from such a suit under the Utah Governmental Immunity Act (the "Act"), Utah Code Ann. §§ 63–30–1 to – 38 (1997) (repealed and replaced by the Governmental Immunity Act of Utah, *id.* §§ 63–30d–101 to –904 (2004 & Supp.2007)).[1] We conclude that it is. The Athletic Commission's failure to prevent Rone from boxing is a licensing decision that is immune from suit under Utah Code section 63–30–10(3) (1997). We further conclude that this statutory grant of immunity does not violate the open courts clause of the Utah Constitution.

## BACKGROUND

¶ 2 Rone, a professional boxer, accepted a fight in Cedar City, Utah, in an attempt to raise sufficient funds to purchase an airline ticket to Ohio for the purpose of attending his mother's funeral. Tragically, Rone died in the ring from heart failure and was buried alongside his mother. Moss filed a lawsuit against the Athletic Commission, claiming that her brother's death was caused by the Athletic Commission's negligence in allowing the fight to proceed.[2]

¶ 3 In support of her negligence claim, Moss alleged that the Athletic Commission had violated a number of its own rules. First, the Pete Suazo Utah Athletic Commission Act Rules (the "Athletic Commission Rules") prohibit any boxer who has lost six consecutive fights from fighting until either the boxing commission has reviewed the fights or the boxer has submitted to a medical examination. Utah Admin. Code r. 151–33–613(8) (2003). Moss alleged that the Athletic Commission failed to review Rone's fights or require that he submit to a medical examination even though he had lost twenty-six consecutive fights.

¶ 4 The Athletic Commission Rules also prescribe procedures to be followed in cases where boxing contestants are knocked out or sustain damaging head blows. Specifically, they provide that in cases where a boxing contestant has lost by a technical knockout, the contestant cannot fight again "for a period of 30 calendar days or until the contestant has submitted to a medical examination." *Id.* r. 151–33–613(1). And in cases where a boxing contestant has been knocked out or received excessive hard blows to the head that rendered him defenseless or incapable of continuing, the Athletic Commission Rules provide that the contestant shall not be permitted to fight for a period of at least sixty days. *Id.* r. 151–33–613(6). Even then, the contestant cannot resume boxing unless a physician certifies that the contestant is fit to box following a neurological examination. *Id.* r. 151–33–613(7). Moss alleges that the Athletic Commission violated these rules by allowing Rone to fight without a neurological examination, despite the fact that he had lost a fight by a technical knockout less than two months before.

¶ 5 The Athletic Commission Rules also state that all boxing contestants must be examined by a physician not less than eight hours before a fight and that contestants who are unfit for competition may not compete. *Id.* r. 151–33–505. Moss alleges that Rone was not examined as required.

¶ 6 Finally, Moss points to Athletic Commission Rule 151–33–613(10), which prohibits a boxer from competing if he has been prohibited from boxing in any other state due to medical reasons. Moss alleges that Nevada

---

1. Because Rone's death occurred before the Governmental Immunity Act of Utah became effective on July 1, 2004, we decide this case under the provisions of its predecessor, the Utah Governmental Immunity Act.

2. Moss also asserted claims against other private individuals and corporations. We do not address these claims because they are not relevant to this appeal.

had prohibited Rone from boxing for medical reasons but that the Athletic Commission nevertheless allowed the fight to go forward.

¶ 7 The Athletic Commission moved to dismiss Moss's lawsuit under rule 12(b)(6) of the Utah Rules of Civil Procedure, arguing that even if all of the allegations contained in the complaint were true, relief would be barred by the Utah Governmental Immunity Act. The district court concurred and granted the motion to dismiss. Moss appealed to this court. We now review the district court's ruling.

## STANDARD OF REVIEW

¶ 8 In reviewing an order of dismissal entered pursuant to rule 12(b)(6), we "accept the material allegations in the complaint as true and interpret those facts and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff as the non-moving party." *Wagner v. State,* 2005 UT 54, ¶ 9, 122 P.3d 599 (internal quotation marks and citation omitted). We review the grant of a rule 12(b)(6) motion for correctness, ceding no deference to the district court. *Oakwood Vill. LLC v. Albertsons, Inc.,* 2004 UT 101, ¶ 9, 104 P.3d 1226.

## ANALYSIS

¶ 9 The district court dismissed the complaint after holding that the Athletic Commission was immune from suit pursuant to Utah Code section 63–30–10(3) (1997). Moss argues that the holding was incorrect. In the alternative, Moss argues that if section 63–30–10(3) does shield the Athletic Commission from liability, it violates the open courts clause of the Utah Constitution. Because we avoid constitutional claims if possible, *Lyon v. Burton,* 2000 UT 19, ¶ 10, 5 P.3d 616, we address the statutory arguments first and then address the constitutional claim.

### I. STATUTORY ANALYSIS

¶ 10 Following the structure of the Utah Governmental Immunity Act, this court has established a three-step analysis to determine whether a government entity is immune from suit for a particular activity:

"First, was the activity the entity performed a governmental function and therefore immunized from suit by the general grant of immunity contained in section 63–30–3? Second, if the activity was a governmental function, has some other section of the Act waived that blanket immunity? Third, if the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in [the] case?"

*Lyon v. Burton,* 2000 UT 19, ¶ 13, 5 P.3d 616 (citation omitted) (quoting *Ledfors v. Emery County Sch. Dist.,* 849 P.2d 1162, 1164 (Utah 1993)).

¶ 11 We now apply this analysis to Moss's claims against the Athletic Commission. With respect to the first factor, there is no question that the activity of licensing boxers constitutes a governmental function as defined by Utah Code section 63–30–2(4)(a) (1997) and that such activity is therefore immunized from suit by the Act's general grant of immunity. Second, because we accept the material allegations of the complaint as true when reviewing a dismissal under rule 12(b)(6), there is no question that the allegedly negligent conduct of the Athletic Commission is subject to the general waiver of immunity for injury caused by the negligent act or omission of government employees. *See id.* § 63–30–10. Thus, resolution of the case turns on the third step of the analysis, specifically, whether the Athletic Commission's allegedly negligent acts and omissions fall within any of the statutory exceptions to the general waiver of immunity. *See id.*

¶ 12 The Athletic Commission argues that it is immune from suit because the actions in question fall within the exception articulated in section 63–30–10(3). That section states that governmental immunity is not waived for "the issuance, denial, suspension, or revocation of or by the failure or refusal to issue, deny, suspend, or revoke any permit, license, certificate, approval, order, or similar authorization." *Id.* § 63–30–10(3). Moss disagrees.

¶ 13 Moss first argues that section 63–30–10(3) should not be applied to licenses granted for activities that pose a high risk to health or safety. Moss produces no case law, however, that directly supports this proposition, nor has she made any attempt to reconcile her proposed interpretation with the language of the statute. Indeed, Moss's proposed interpretation would place a condition on the applicability of the exception without any textual justification. We decline to stray from the plain meaning of the text where the statute is unambiguous and there is no compelling reason to believe that the legislature has misspoken. *Lyon,* 2000 UT 19, ¶ 17, 5 P.3d 616 (" '[W]here the statutory language is plain and unambiguous, we do not look beyond the language's plain meaning . . . .' " (quoting *Horton v. Royal Order of the Sun,* 821 P.2d 1167, 1168 (Utah 1991))); *see also Savage v. Utah Youth Vill.,* 2004 UT 102, ¶ 18, 104 P.3d 1242 (holding that a statute may be interpreted contrary to its plain meaning only where the plain language "works an absurd result or is unreasonably confused, inoperable, or in blatant contravention of the express purpose of a statute" (internal quotation marks and citation omitted)). In addition, Moss's proposed interpretation is contrary to a reading of the Immunity Act as a whole, which immunizes many governmental acts or omissions that impact life and safety. *See, e.g.,* Utah Code Ann. § 63–30–10(2) (assault and battery); *id.* § 63–30–10(7) (riots, mob violence, and civil disturbances); *id.* § 63–30–10(18) (emergency medical assistance, fire fighting, and regulating hazardous materials).

▆▆ ¶ 14 Moss also argues that the Athletic Commission's duty to prevent Rone from fighting under its regulations was separate from its decision to "issue, deny, suspend, or revoke" his boxing license. As support for this argument, Moss points to the fact that several of the regulations allegedly ignored by the Athletic Commission do not explicitly mention the suspension or revocation of a boxing license but simply state that the contestant "shall be prohibited from boxing" or "competing" if certain conditions are not met. Utah Admin. Code rr. 151–33–505(1)–(2), –613(8), –613(10) (2003). In other words, Moss argues that the Athletic Commission's

negligence was not directly tied to a licensing decision and therefore the Athletic Commission is not entitled to immunity under section 63–30–10(3).

▆▆ ¶ 15 We reject Moss's proposed interpretation of the exception as inconsistent with the statutory language. Utah Code section 63–30–10(3) provides that immunity is not waived for injuries that "arise[ ] out of, in connection with, or result[ ] from" the revocation or suspension of "any permit, license, certificate, *approval,* order, *or similar authorization.*" Utah Code Ann. § 63–30–10(3) (emphasis added). This language is broad. It certainly is not restricted to those decisions that constitute licensing decisions per se. Rather, it extends to approvals and similar authorizations, such as the Athletic Commission's decision to allow Rone's participation in the boxing match.

¶ 16 This interpretation is supported by our analysis in *Gillman v. Department of Financial Institutions,* 782 P.2d 506 (Utah 1989). In that case, two financial institutions were mismanaged and ultimately filed bankruptcy, resulting in losses to investors. *Id.* at 507–08. The bankruptcy trustee brought suit against the Utah Department of Financial Institutions, alleging that the bankruptcies were caused by the department's negligence in failing to properly inspect and regulate the lenders as required by statute. *Id.* at 508. The principal issue we addressed was whether the alleged negligence resulted from a licensing decision or from some other duty separable from the department's licensing function. *Id.* at 509.

¶ 17 We rejected the theory that the statutorily mandated regulation of a license holder is not a licensing decision. Even though the statutes mandating that the department inspect the lenders on a yearly basis did not specifically reference the lenders' licenses, we noted that "the only sanction the Department can impose on a licensed financial institution for misconduct of any kind is to suspend or revoke the financial institution's operating license." *Id.* at 511. Therefore, "any injury resulting from a Department action or inaction ultimately re-

sults from a failure to suspend or revoke [the lender's] license, an immune act." *Id.*

¶ 18 We further held that a statute mandating regulation need not explicitly reference an entity's license in order for the regulation to constitute a licensing decision. For example, one of the relevant statutes did not refer to a lender's license but simply stated that if serious problems were detected, "the Department is authorized to take possession of any banking institution and suspend its privilege of conducting business." *Id.* at 511 n. 7. We concluded that by taking such action, "the Department essentially suspends or revokes the financial organization's operating license." *Id.*

¶ 19 Under the standard adopted in *Gillman*, all of Moss's allegations of negligence are directed to licensing decisions for which immunity has not been waived. Moss essentially alleges that the State was negligent in not following regulations that would have prohibited Rone from fighting. Even though some of the Athletic Commission Rules do not label the Athletic Commission's authority to prevent boxers from competing as the revocation or suspension of a boxing license, the Athletic Commission's authority to prevent a boxer from competing is indistinguishable from a licensing decision. The essential element of such a decision continues to be whether to retract governmental authorization of private activity.

¶ 20 We therefore reject both of Moss's statutory arguments and hold that the Athletic Commission is immune from suit under the terms of Utah Code section 63–30–10(3).

## II. CONSTITUTIONAL ANALYSIS

■ ¶ 21 Having concluded that the Athletic Commission is immune from suit for the actions of which Moss complains, we now turn to the question of whether the legislature acted within the limits drawn by the Utah Constitution in restricting governmental liability. The open courts clause of the Utah Constitution provides:

> All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

Utah Const. art. I, § 11.

¶ 22 In interpreting this provision, we have held that the State may constitutionally immunize itself from suit if it can satisfy either prong of the test set forth in *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah 1980). *Tindley v. Salt Lake City Sch. Dist.*, 2005 UT 30, ¶ 22, 116 P.3d 295; *DeBry v. Noble*, 889 P.2d 428, 440 (Utah 1995). Under this test, Moss must "overcome the presumption of constitutionality that attaches to subsection[ ](3) . . . of § 63–30–10." *DeBry*, 889 P.2d at 441. Therefore, immunity is proper if the Athletic Commission can successfully defend either (1) the presumption that "the activity under consideration is of such a unique nature that it can only be performed by a governmental agency" or (2) the presumption that the activity "is essential to the core of governmental activity." *Standiford*, 605 P.2d at 1236–37; *accord Tindley*, 2005 UT 30, ¶ 22, 116 P.3d 295;[3] *DeBry*, 889 P.2d at 433, 440.

¶ 23 We first address the question of whether the regulation of professional boxing is "of such a unique nature that it can only be performed by a governmental agency." *Standiford*, 605 P.2d at 1236–37. Moss asserts that because amateur boxing and other professional sports are not regulated by the government, the regulation of professional boxing could likewise be performed by a private entity. In applying our precedent on this issue, however, we find that the regulation of professional boxing is uniquely gov-

---

3. We note that in *Laney v. Fairview City*, 2002 UT 79, 57 P.3d 1007, we misquoted the second prong of the *Standiford* test as being whether the activity "is essential to the core of governmental *immunity*," rather than "activity" as the quote should read. *Id.* ¶ 52 (emphasis added). We then perpetuated that error when we quoted *Laney* in *Tindley*, 2005 UT 30, ¶ 22, 116 P.3d 295. We note that the test for the second prong articulated in *Laney* and *Tindley* merely begs the question, and we affirm that the proper formulation of the test is whether the activity in question "is essential to the core of governmental activity." *Standiford*, 605 P.2d at 1236–37.

ernmental because government regulation in this area is qualitatively different from the type of regulation that could be provided by a private organization.

¶ 24 In *Madsen v. Borthick*, 658 P.2d 627, 631 (Utah 1983), we applied the uniquely governmental prong of the *Standiford* test to state regulation of financial institutions.[4] In so doing, we held that "*Standiford's* reference to activities that 'can only be performed by a governmental agency' does not preclude governmental immunity for supervisory functions in some respects similar to those that could be performed by a private association authorized by agreement, such as self-regulation by an industry." *Id.* Using this reasoning, we held that "governmental supervision of financial institutions in the public interest ... and private oversight by a voluntary association of businesses are qualitatively different." *Id.*

¶ 25 Later, in *DeBry v. Noble*, we expanded upon this rationale when called upon to determine whether conducting building inspections was a uniquely governmental function:

> Practically speaking, only government can enact binding, enforceable building standards designed to protect the entire community. Although private groups may ostensibly perform somewhat similar functions, there is a qualitative difference between government's actions and those of private groups. The issuance of permits is integral to assuring compliance with building code standards. Licensing to insure compliance with those standards is not a function that can be privately performed.

*DeBry*, 889 P.2d at 442 (citation omitted).

¶ 26 Like the regulation of financial institutions and building code standards, the regulation of professional boxing is uniquely governmental in nature. Although a private boxing association could theoretically regulate professional boxing in Utah, such regulation would differ qualitatively from the regulation provided by the government. Only the government can regulate the sport for the common good, rather than for the benefit of a select, financially interested sector of the boxing industry. Only the government may wield its police power to ensure that safety regulations are followed. We weigh these considerations heavily in finding the regulation of boxing to be uniquely governmental because of the inherent dangers of the sport.

¶ 27 Finally, even absent these compelling considerations, the regulation of boxing is quite literally a uniquely governmental activity because federal law prohibits private associations from independently regulating the sport. Under federal statute, "[n]o person may arrange, promote, organize, produce, or fight in a professional boxing match held in a State that does not have a boxing commission unless the match is supervised by a boxing commission from another State...." 15 U.S.C. § 6303(a) (2000). A "boxing commission" is defined by statute as "an entity authorized under State law to regulate professional boxing matches." *Id.* § 6301(2)(A). Therefore, even under a generous reading of this statute, a private association simply may not regulate professional boxing absent oversight and regulation by state government.

¶ 28 Because the regulation of boxing is a uniquely governmental activity, the legislative grant of governmental immunity at issue here does not violate the open courts clause of the Utah Constitution. We therefore need not consider the core governmental activity prong of the *Standiford* test.

## CONCLUSION

¶ 29 We hold that all of Moss's claims for relief are barred by Utah Code section 63–

---

4. The *Standiford* test was initially adopted as a method of statutory interpretation to determine what constituted a "governmental function" under a prior version of the Utah Governmental Immunity Act. *Standiford*, 605 P.2d at 1232, 1236–37. The *Standiford* test was only later adopted as a constitutional standard in *DeBry v.* *Noble*, 889 P.2d at 440. Therefore, the *Madsen* court applied the *Standiford* test as a statutory, rather than a constitutional, tool of interpretation. However, because the test is identical in both situations, *Madsen* is applicable to the present case.

30–10(3) (1997). We further hold that application of the Governmental Immunity Act in this situation does not violate the open courts clause of the Utah Constitution. We therefore affirm the district court's order dismissing Moss's claims against the Athletic Commission under rule 12(b)(6) of the Utah Rules of Civil Procedure.

¶ 30 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH'S opinion.